MACKEY *v.* UNITED STATES

No. 36.   Argued October 21, 1970—Decided April 5, 1971

WHITE, J., announced the Court's judgment and delivered an opinion in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined. HARLAN, J., filed an opinion concurring in the judgment, *post*, p. 675. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 702. DOUGLAS, J., filed a dissenting opinion, in which BLACK, J., joined, *post*, p. 713.

*William M. Ward* argued the cause and filed briefs for petitioner.

*Matthew J. Zinn* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Francis X. Beytagh, Jr., Beatrice Rosenberg,* and *Mervyn Hamburg.*

MR. JUSTICE WHITE announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join.

An indictment was returned in March 1963 charging petitioner Fred T. Mackey in five counts of evading payment of income taxes by willfully preparing and causing to be prepared false and fraudulent tax returns for the years 1956 through 1960, in violation of 26 U. S. C. § 7201. On January 21, 1964, a jury in the District Court for the Northern District of Indiana found Mackey guilty on all five counts.[1] The conviction was affirmed on appeal by the Court of Appeals for the

---

[1] Petitioner received a sentence of five years' imprisonment and a fine of $10,000 on each count, the prison terms to be served concurrently.

Seventh Circuit in the spring of 1965. 345 F. 2d 499 (CA7), cert. denied, 382 U. S. 824 (1965).

At petitioner's trial, the Government used the net-worth method to prove evasion of income taxes.[2] As part of its case, it introduced 60 wagering excise tax returns—one for every month of each of the five years covered by the indictment—filed by petitioner pursuant to 26 U. S. C. § 4401. A summary exhibit prepared from these returns and petitioner's income tax returns were also introduced, and an Internal Revenue Service technical advisor testified that for the years in question the totals of the gross amount of wagers reported on the wagering tax returns, less the expenses of running petitioner's "policy wheel" operation as reported on his annual income tax returns, exceeded the net profits from gambling reported on the petitioner's income tax returns. Defense counsel objected to the introduction of these exhibits, arguing that they were prejudicial, inflammatory, and irrelevant; the Government responded that the wagering tax returns and the summary exhibit were relevant because they showed a likely source of unreported income. The exhibits were admitted, and the Court of Appeals found, without specific discussion, no error in the ruling.[3]

On January 29, 1968, this Court held that the Fifth Amendment privilege against compulsory self-incrimination was a valid defense to a prosecution for failure to register as a gambler and to pay the related occupational and gambling excise taxes under 26 U. S. C.

---

[2] This method of prosecution is discussed and approved in *Holland* v. *United States,* 348 U. S. 121 (1954); *Friedberg* v. *United States,* 348 U. S. 142 (1954); *Smith* v. *United States,* 348 U. S. 147 (1954); *United States* v. *Calderon,* 348 U. S. 160 (1954).

[3] In rejecting petitioner's application for relief under 28 U. S. C. § 2255, the District Judge so read the Court of Appeals' earlier opinion. See App. 28.

§§ 4401, 4411, 4412. *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968). Petitioner, who had begun serving his sentence in December 1965, filed on February 12, 1968, a motion pursuant to 28 U. S. C. § 2255 to vacate his sentence and set aside the judgment of conviction on authority of *Marchetti* and *Grosso.* The motion was denied by the District Court for the Northern District of Indiana,[4] and the Court of Appeals affirmed. 411 F. 2d 504 (CA7 1969).

Although the Court of Appeals suggested that petitioner's argument that he had not waived the Fifth Amendment claim by his failure to raise it at trial was open to question, 411 F. 2d, at 506–507, it specifically held that *Marchetti* and *Grosso* would not be applied retroactively to upset a pre-*Marchetti* conviction for

---

[4] The District Court advanced several reasons for denying petitioner's application. See App. 27–38. Noting that with gambling excise tax returns "there is little danger of their unreliability other than their possible understatement of liability," *id.,* at 32, the District Judge held that *Marchetti* and *Grosso* should not be applied to petitioner's case:

"An examination of these and other cases reveals no instance where the [Supreme] Court has given retroactive application to an exclusionary rule or other Constitutional guarantee where the reliability of the fact finding process had not been jeopardized. The briefs for [Mackey] have suggested none. In [petitioner] Mackey's trial, the introduction of the wagering tax forms did not jeopardize the integrity of the trial except to the extent that they showed that he was engaged in illegal activities other than that charged. This possibility was raised by Mackey's attorneys at the trial, and apparently on appeal, and both times the Courts held that there was no error." *Id.,* at 36.

We note in reference to the last point mentioned by the District Judge that at trial the court's charge to the jury included several strong admonitions to the effect that the question of whether any business run by petitioner was legal or illegal was irrelevant to the offense charged in the indictment—failure to report income for five years. See Brief for the United States 11.

evading payment of income tax simply because the wagering excise tax returns filed pursuant to 26 U. S. C. § 4401 were introduced in evidence at trial. Employing the threefold analysis set forth in our retroactivity decisions, see, *e. g., Stovall* v. *Denno,* 388 U. S. 293, 297 (1967), the Court of Appeals found that law enforcement officials had relied on the old rule, that retroactive application of *Marchetti* and *Grosso* in cases such as petitioner's would have a substantial impact on the administration of justice, and that "[t]he unreliability of the fact-finding process which is the touchstone of retroactivity is simply not threatened by the impersonal command of the wagering tax laws." 411 F. 2d, at 509. We granted certiorari. 396 U. S. 954.

## I

In *United States* v. *Kahriger,* 345 U. S. 22 (1953), a prosecution for failure to register and pay the gambling tax, this Court held that the registration requirement and the obligation to pay the gambling tax did not violate the Fifth Amendment. The Court construed the privilege as relating "only to past acts, not to future acts that may or may not be committed. . . . Under the registration provisions of the wagering tax, appellee is not compelled to confess to acts already committed, he is merely informed by the statute that in order to engage in the business of wagering in the future he must fulfill certain conditions." 345 U. S., at 32–33. *Lewis* v. *United States,* 348 U. S. 419 (1955), reaffirmed this construction of the Fifth Amendment. Thirteen years later we could not agree with what was deemed an "excessively narrow" view of the scope of the privilege. 390 U. S., at 52. The "force of the constitutional prohibition is [not] diminished merely because confession of a guilty purpose precedes the act which it is subsequently employed to

evidence." 390 U. S., at 54. The gambling registration and tax requirements were held to present substantial risks of self-incrimination and therefore to be unenforceable; imposition of criminal penalties for noncompliance was an impermissible burden on the exercise of the privilege.

Until *Marchetti* and *Grosso,* then, the registration and gambling tax provisions had the express approval of this Court; the Fifth Amendment provided no defense to a criminal prosecution for failure to comply. But as of January 29, 1968, the privilege was expanded to excuse noncompliance. The statutory requirement to register and file gambling tax returns was held to compel self-incrimination and the privilege became a complete defense to a criminal prosecution for failure to register and pay the related taxes. It followed that the registration and excise tax returns filed in response to the statutory command were compelled statements within the meaning of the Fifth Amendment and accordingly were inadmissible in evidence as part of the prosecution's case in chief. The question before us is whether the *Marchetti-Grosso* rule applies retroactively and invalidates Mackey's conviction because his gambling excise tax returns were introduced against him at his trial for income tax evasion.

We have today reaffirmed the nonretroactivity of decisions overruling prior constructions of the Fourth Amendment. *Williams* v. *United States* and *Elkanich* v. *United States, ante,* p. 646. The decision in those cases represents the approach to the question of when to accord retroactive sweep to a new constitutional rule taken by this Court in the line of cases from *Linkletter* [5] in 1965 to *Desist* [6] in 1969. Among those cases were two which determined that earlier decisions extending the

---

[5] *Linkletter* v. *Walker,* 381 U. S. 618 (1965).

[6] *Desist* v. *United States,* 394 U. S. 244 (1969).

reach of the Fifth Amendment privilege against compelled self-incrimination would not be retroactively applied to invalidate prior convictions that in all respects conformed to the then-controlling law.

In *Tehan* v. *Shott,* 382 U. S. 406 (1966), the Court declined to apply the rule of *Griffin* v. *California,* 380 U. S. 609 (1965), to prisoners seeking collateral relief. *Griffin* had construed the Fifth Amendment to forbid comment on defendants' failure to testify, thereby removing a burden from the exercise of the privilege against compulsory self-incrimination and further implementing its purpose. The basic purpose of the privilege, we said, was not related to "protecting the innocent from conviction," 382 U. S., at 415; the privilege "is not an adjunct to the ascertainment of truth," but is aimed at serving the complex of values on which it has historically rested. 382 U. S., at 416. Given this purpose, clear reliance on the pre-*Griffin* rules, and the frustration of state interests which retroactivity would have entailed, we refused relief to a state prisoner seeking collateral relief although the prosecutor's comment on his failure to take the stand at his trial would have infringed the new rule that was announced in *Griffin* and was being applied in contemporary trials.

*Johnson* v. *New Jersey,* 384 U. S. 719 (1966), reaffirmed this view of the Fifth Amendment by declining to apply the *Miranda* [7] rules to cases pending on direct review as well as to those involving applications for collateral relief. Stating that the "prime purpose of these rulings is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice," 384 U. S., at 729, the Court also recognized that the new rules to some extent did guard against the possibility of unreliable admissions given

_____

[7] *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

during custodial interrogation. *Id.*, at 730. The question, however, was one of "probabilities." The hazard of untrustworthy results in past trials was not sufficiently apparent to require retroactive application in view of the existing, well-defined remedies against the use of many involuntary confessions, the obvious fact that the new warnings had not been standard practice prior to *Miranda,* and the consequent disruption to the administration of the criminal law.

## II

Guided by our decisions dealing with the retroactivity of new constitutional interpretations of the broad language of the Bill of Rights, we agree with the Court of Appeals that *Marchetti* and *Grosso* should not have any retroactive effect on Mackey's conviction. Petitioner was convicted in strict accordance with then-applicable constitutional norms. Mackey would have a significant claim only if *Marchetti* and *Grosso* must be given full retroactive sweep. But in overruling *Kahriger* and *Lewis,* the Court's purpose was to provide for a broader implementation of the Fifth Amendment privilege—a privilege that does not include at its core a concern for improving the reliability of the results reached at criminal trials. There is no indication in *Marchetti* or *Grosso* that one of the considerations which moved the Court to hold that the Congress could not constitutionally compel citizens to register as gamblers and file related tax returns was the probable unreliability of such statements once given. Petitioner has not advanced any objective considerations suggesting such unreliability. The wagering tax returns introduced in evidence at his trial have none of the characteristics, and hence none of the potential unreliability, of coerced confessions produced by "overt and obvious coercion." *Johnson,* 384 U. S., at 730. Nor does Mackey suggest that his returns—made under

oath—were inaccurate in any respect.[8]   Thus, a gambling excise tax return, like physical evidence seized in violation of a new interpretation of the Fourth Amendment, is concededly relevant and probative even though obtained by the Government through means since defined by this Court as constitutionally objectionable.   As in *Desist, Elkanich,* and *Williams,* the result here should be that a pre-*Marchetti* trial in which the Government employed such evidence is not set aside through retroactive application of the new constitutional principle.

The short of the matter is that *Marchetti* and *Grosso* raise not the slightest doubt about the accuracy of the verdict of guilt returned here.   Under these circumstances, the principles represented by *Elkanich* and *Williams,* as well as by *Tehan* and *Johnson,* must control. For *Tehan* and *Johnson* indicate that even though decisions reinterpreting the Fifth Amendment may create marginal doubts as to the accuracy of the results of past trials, the purposes of those decisions are adequately served by prospective application.   Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Mr. Justice Harlan, concurring in the judgments in Nos. 36 and 82 and dissenting in No. 81.

These three cases have one question in common: the extent to which new constitutional rules prescribed by this Court for the conduct of criminal cases are applicable to other such cases which were litigated under different but then-prevailing constitutional rules.

One of these cases is before us on direct review, No. 81, *Williams,* the other two being here on collateral review, No. 82, *Elkanich,* and No. 36, *Mackey.* In each instance the new rule is held not applicable, and, in

---

[8] See n. 4, *supra.*

consequence, the judgments below are affirmed, without reaching the merits of the underlying questions presented. Two of the cases, *Williams* and *Elkanich,* involve the Court's decision in *Chimel* v. *California,* 395 U. S. 752 (1969), changing the rule as to the scope of permissible searches and seizures incident to a lawful arrest. The other case, *Mackey,* involves the Court's decisions in *Marchetti* v. *United States,* 390 U. S. 39 (1968), and *Grosso* v. *United States,* 390 U. S. 62 (1968), changing the rule as to the application of the privilege against self-incrimination with respect to criminal prosecutions arising under the federal gambling tax statutes.

Today's decisions mark another milestone in the development of the Court's "retroactivity" doctrine, which came into being somewhat less than six years ago in *Linkletter* v. *Walker,* 381 U. S. 618 (1965). That doctrine was the product of the Court's disquietude with the impacts of its fast-moving pace of constitutional innovation in the criminal field. Some members of the Court, and I have come to regret that I was among them, initially grasped this doctrine as a way of limiting the reach of decisions that seemed to them fundamentally unsound. Others rationalized this resort to prospectivity as a "technique" that provided an "impetus . . . for the implementation of long overdue reforms, which otherwise could not be practicably effected." *Jenkins* v. *Delaware,* 395 U. S. 213, 218 (1969). The upshot of this confluence of viewpoints was that the subsequent course of *Linkletter* became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim. See my dissenting opinion in *Desist* v. *United States,* 394 U. S. 244, 256–257 (1969). See also *United States* v. *United States Coin & Currency, post,* p. 728 (appendix to concurring opinion of BRENNAN, J.). It was this train of events that impelled me to suggest two Terms ago in *Desist* that the time had come for us

to pause to consider just where these haphazard developments might be leading us. That is what I had thought underlay the taking of these cases, and their companions, *United States* v. *United States Coin & Currency, post,* p. 715, and *Hill* v. *California, post,* p. 797. Regrettably, however, this opportunity has largely eventuated in little more than a reaffirmation of the post-*Linkletter* developments.

What emerges from today's decisions is that in the realm of constitutional adjudication in the criminal field the Court is free to act, in effect, like a legislature, making its new constitutional rules wholly or partially retroactive or only prospective as it deems wise. I completely disagree with this point of view. While I do not subscribe to the Blackstonian theory that the law should be taken to have always been what it is said to mean at a later time, I do believe that whether a new constitutional rule is to be given retroactive or simply prospective effect must be determined upon principles that comport with the judicial function, and not upon considerations that are appropriate enough for a legislative body.

## I

At the outset, I think it is clear that choosing a binding, generally applicable interpretation of the Constitution presents a problem wholly different from that of choosing whether to apply the rule so evolved "retroactively" to other cases arising on *direct* review.

In adopting a particular constitutional principle, this Court very properly weighs the nature and purposes of various competing alternatives, including the extent to which a proposed rule will enhance the integrity of the criminal process and promote the efficient administration of justice, as well as the extent to which justifiable expectations have grown up surrounding one rule or another. Indeed, it is this very process of weighing such

factors that should constitute the core of our task in giving concrete embodiment to those constitutional commands that govern the procedures by which the State and Federal Governments enforce their criminal laws.

But we possess this awesome power of judicial review, this duty to bind coordinate branches of the federal system with our view of what the Constitution dictates, only because we are a court of law, an appellate court charged with the responsibility of adjudicating cases or controversies according to the law of the land and because the law applicable to any such dispute necessarily includes the Federal Constitution. That is the classic explanation for the basis of judicial review, an explanation first put forth by Chief Justice Marshall in *Marbury* v. *Madison*, 1 Cranch 137, 177–178 (1803), and from that day to this the sole continuing rationale for the exercise of this judicial power:

> "Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation . . . .
>
> .    .    .    .    .
>
> "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.
>
> .    .    .    .    .
>
> "If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."

We announce new constitutional rules, then, only as a correlative of our dual duty to decide those cases over

which we have jurisdiction and to apply the Federal Constitution as one source of the matrix of governing legal rules. We cannot release criminals from jail merely because we think one case is a particularly appropriate one in which to apply what reads like a general rule of law or in order to avoid making new legal norms through promulgation of dicta. This serious interference with the corrective process is justified only by necessity, as part of our task of applying the Constitution to cases before us. Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from this model of judicial review.

If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. If there is no need for an anti-majoritarian judicial control over the content of our legal system in nine cases precisely like that presented by Mr. Chimel's dispute with the State of California, it is hard to see the necessity, wisdom, or justification for imposing that control in the *Chimel* case itself. In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation. We apply and definitively interpret the Constitution, under this view of our role, not because we are bound to, but only because we occasionally deem it appropriate, useful, or wise. That sort of choice may permissibly be made by a legislature or a council of revision, but not by a court of law.

The notion that cases before us on direct review need not be adjudicated in accordance with those legal princi-

ples governing at the time we are possessed of jurisdiction in the case entails additional significant untoward consequences. By this doctrine all other courts in this country are, in effect, reduced largely to the role of automatons, directed by us to apply mechanistically all then-settled federal constitutional concepts to every case before them. No longer do the inferior courts—and, in the constitutional realm, all courts are inferior to us—bear responsibility for developing or interpreting the Constitution. For it is a necessary corollary of this current retroactivity doctrine that an inferior court errs when it arrives at a result which this Court subsequently adopts but later decides must operate prospectively only. See my dissent in *Desist,* 394 U. S., at 259. Cf. *United States* v. *White, post,* p. 754 (Part II), and my dissenting opinion in that case, *post,* p. 768. See also *United States* v. *United States Coin & Currency, post,* p. 730 (WHITE, J., dissenting). Although it is necessary for the proper functioning of the federal system that this Court possess the last word on issues of federal constitutional law, it is intolerable that we take to ourselves the sole ability to speak to such problems.

Refusal to apply new constitutional rules to all cases arising on direct review may well substantially deter those whose financial resources are barely sufficient to withstand the costs of litigating to this Court, or attorneys who are willing to make sacrifices to perform their professional obligation in its broadest sense, from asserting rights bottomed on constitutional interpretations different from those currently prevailing in this Court. More importantly, it tends to cut this Court loose from the force of precedent, allowing us to restructure artificially those expectations legitimately created by extant law and thereby mitigate the practical force of *stare decisis, Linkletter* v. *Walker,* 381 U. S., at 644 (BLACK, J., dissenting), a force which ought properly to bear on the

judicial resolution of any legal problem. Cf. *Moragne* v. *States Marine Lines,* 398 U. S. 375, 403 (1970).

One could catalogue virtually *ad infinitum* what I view as unacceptable ancillary consequences of this aspect of the Court's ambulatory retroactivity doctrine. For me, the fact that this doctrine entails an inexplicable and unjustifiable departure from the basic principle upon which rests the institution of judicial review is sufficient to render it untenable. I continue to believe that a proper perception of our duties as a court of law, charged with applying the Constitution to resolve every legal dispute within our jurisdiction on direct review, mandates that we apply the law as it is at the time, not as it once was. Inquiry into the nature, purposes, and scope of a particular constitutional rule is essential to the task of deciding whether that rule should be made the law of the land. That inquiry is, however, quite simply irrelevant in deciding, once a rule has been adopted as part of our legal fabric, which cases then pending in this Court should be governed by it.

## II

Of the cases presently under discussion, only *Williams* involves direct review of a nonfinal criminal judgment. The other two, *Elkanich* and *Mackey,* were brought here by persons in federal custody, seeking release through issuance of a writ of habeas corpus.[1] At the time their

---

[1] I realize, of course, that state prisoners are entitled to seek release via habeas corpus under 28 U. S. C. § 2241, while federal prisoners technically utilize what is denominated a motion to vacate judgment under 28 U. S. C. § 2255. However, our cases make these remedies virtually congruent and the purpose of substituting a motion to vacate for the traditional habeas action in the federal system was simply to alter one minor jurisdictional basis for the writ. See *United States* v. *Hayman,* 342 U. S. 205 (1952). As I do not propose to make any distinction, for retroactivity purposes,

convictions became final, there was no constitutional error in the conviction of either. Since that time subsequent decisions of this Court have formulated new constitutional rules that invalidate the procedures like those involved in their trials.

While, as I have just stated, I think it clear what law should be applied to nonfinal convictions here on direct review, the choice of law problem as it applies to cases here on habeas seems to me a much more difficult one. However, that choice, in my view, is also one that can be responsibly made only by focusing, in the first instance, on the nature, function, and scope of the adjudicatory process in which such cases arise. The relevant frame of reference, in other words, is not the purpose of the new rule whose benefit the petitioner seeks, but instead the purposes for which the writ of habeas corpus is made available.

As I first pointed out in my dissent in *Desist,* 394 U. S., at 260–261, this Court's function in reviewing a decision allowing or disallowing a writ of habeas corpus is, and always has been, significantly different from our role in reviewing on direct appeal the validity of nonfinal criminal convictions. While the entire theoretical underpinnings of judicial review and constitutional supremacy dictate that federal courts having jurisdiction on direct review adjudicate every issue of law, including federal constitutional issues, fairly implicated by the trial process below and properly presented on appeal, federal courts have never had a similar obligation on habeas corpus.

Habeas corpus always has been a *collateral* remedy, providing an avenue for upsetting judgments that

between state and federal prisoners seeking collateral relief, I shall refer throughout this opinion to both procedures as the writ of habeas corpus, and cases before us involving such judgments as cases here on collateral review.

have become otherwise final. It is not designed as a substitute for direct review. The interest in leaving concluded litigation in a state of repose, that is, reducing the controversy to a final judgment not subject to further judicial revision, may quite legitimately be found by those responsible for defining the scope of the writ to outweigh in some, many, or most instances the competing interest in readjudicating convictions according to all legal standards in effect when a habeas petition is filed. Indeed, this interest in finality might well lead to a decision to exclude completely certain legal issues, whether or not properly determined under the law prevailing at the time of trial, from the cognizance of courts administering this collateral remedy. This has always been the case with collateral attacks on final civil judgments.[2] More immediately relevant here is the fact that

___

[2] For example, we have more than once in recent years had before us a libel case in which a party was allegedly libeled and brought suit for redress prior to this Court's decision in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), where we announced a new constitutional rule governing liability in libel suits brought by public officials. Yet no one connected with such cases has ever been heard to do so much as hint that the *New York Times* rule is not applicable because the conduct complained of occurred or the suit was brought before this new rule was promulgated. See, *e. g., Rosenblatt* v. *Baer,* 383 U. S. 75 (1966). Cf. *Thorpe* v. *Housing Authority,* 393 U. S. 268, 281–283 (1969).

Conversely, is it not perfectly clear that, had such a party procured and collected a final damage award prior to *New York Times,* the defendant could not have urged that the case be reopened solely because of our subsequent decision in that case? Absent proof of fraud or want of jurisdiction in the trial court that judgment would be *res judicata* and entitled to full faith and credit throughout the land.

This is not to suggest that civil and criminal collateral attack ought necessarily to be precisely congruent in the federal system. But certainly it illustrates that the law has always perceived collateral attack as a problem quite different from direct appeal.

prior to *Brown* v. *Allen,* 344 U. S. 443 (1953), federal courts would never consider the merits of a constitutional claim raised on habeas if the petitioner had a fair opportunity to raise his arguments in the original criminal proceeding, see my dissent in *Fay* v. *Noia,* 372 U. S. 391, 449–463 (1963), unless the petitioner attacked the constitutionality of the federal, *Ex parte Siebold,* 100 U. S. 371 (1880), or state, *Crowley* v. *Christensen,* 137 U. S. 86 (1890), statute under which he had been convicted. See generally Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 463 (1963); Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1040, 1042–1062 (1970).

Thus, prior to *Brown* v. *Allen,* it must have been crystal clear that the "retroactivity" of a new constitutional rule was a function of the scope and purposes of the habeas corpus writ. Absent unusual circumstances, a new rule was not cognizable on habeas simply because of the limited scope of the writ. While the extent of inquiry into alleged constitutional error on habeas has been drastically expanded in the past 20 years, the retroactivity problem remains analytically constant. In my view, the issues respectively presented by the two cases I treat here that arise on collateral review (*Elkanich* and *Mackey*)— whether the new rules of the *Chimel* case and the *Marchetti* and *Grosso* cases should be applied "retroactively"—must be considered as none other than a problem as to the scope of the habeas writ. We can properly decline to apply the *Chimel* rule, or the principles of *Marchetti* and *Grosso,* to the present cases only if that is consistent with the reasons for the provision, in our federal legal system, of a habeas corpus proceeding to test the validity of an individual's official confinement.

Thus I am led to make some inquiry into the purposes of habeas. At the outset I must note that this faces

me with difficult problems. I have consistently protested a long course of habeas decisions in this Court which, I still believe, constitute an unsound extension of the historic scope of the writ and an unfortunate display of insensitivity to the principles of federalism which underlie the American legal system. See, *e. g., Fay* v. *Noia,* 372 U. S. 391, 448 (1963); *Sanders* v. *United States,* 373 U. S. 1, 23 (1963); *Kaufman* v. *United States,* 394 U. S. 217, 242 (1969); *Townsend* v. *Sain,* 372 U. S. 293, 325 (1963) (STEWART, J., dissenting). If I felt free to decide the present cases consistently with my own views of the legitimate role of the Great Writ, I should have little difficulty. But as my views on this score have not commended themselves to most of my Brethren, I feel obliged to approach these two collateral cases within the framework of current habeas corpus doctrine. This is not an easy exercise, for present habeas corpus decisions provide little assistance in fathoming the underlying understanding of habeas corpus upon which these decisions have been premised. The short of the matter is that this Court has in recent times yet to produce any considered, coherent statement of the general purposes of habeas. In considering the problem of "retroactivity" on direct review, it is possible to work from a general classic theory of judicial review, but while the specific uses of the habeas writ have greatly multiplied, the earlier perception of its general metes and bounds has been swallowed up and gone unreplaced. About the only way to proceed is to work from the bottom up, ascertaining first which issues are cognizable on habeas, and which are not, and thereafter inferring what must be thought to be the nature of the writ.

I start with the proposition that habeas lies to inquire into every constitutional defect in any criminal trial, where the petitioner remains "in custody" because of the judgment in that trial, unless the error committed was

knowingly and deliberately waived or constitutes mere harmless error. That seems to be the implicit premise of *Brown* v. *Allen, supra,* and the clear purport of *Kaufman* v. *United States, supra.* This is not to say, however, that the function of habeas corpus is to provide a federal forum for determining whether any individual is presently "in custody in violation of the constitution . . . of the United States," 28 U. S. C. § 2254 (1964 ed., Supp. V), in the sense that the basis for his incarceration would, under the law existing at the time a petition is filed or adjudicated, as distinguished from the law that was applicable at the time his conviction became final, be held free of constitutional error. Cf. Meador, Habeas Corpus and the "Retroactivity" Illusion, 50 Va. L. Rev. 1115 (1964).

While it has been generally, although not universally, assumed that habeas courts should apply current constitutional law to habeas petitioners before them,[3] I do not believe this is or should be the correct view. First, no such proposition has ever been squarely considered and embraced by this Court, at least since the recent proliferation of criminal defendants' protected constitutional

---

[3] Professor Mishkin has pointed out that "prior to *Linkletter,* the criteria applied in federal habeas corpus proceedings were uniformly the constitutional standards in effect at the time of those proceedings, regardless of when the conviction was actually entered." Mishkin, The Supreme Court 1964 Term—Foreword: The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 78 (1965). See also, *e. g.,* Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1040, 1151, 1153 (1970); *Sanders* v. *United States,* 373 U. S. 1, 17 (1963); *Miller* v. *Gladden,* 341 F. 2d 972, 975 (CA9 1965).

For a counter-example, see *Milton* v. *Wainwright,* 306 F. Supp. 929 (SD Fla. 1969), where a district judge adjudicating a habeas petition declined to consider any of this Court's decisions relating to involuntary confessions that postdated 1958, the time at which the petitioner's murder conviction became final. See also n. 4, *infra.*

rights and the concomitant expansion of the writ.[4] Moreover, applying current constitutional standards to convictions finalized while different views were ascendant appears unnecessary to achieve the ends sought by *Brown* and *Kaufman*. The primary justification given by the Court for extending the scope of habeas to all alleged constitutional errors is that it provides a quasi-appellate review function, forcing trial and appellate courts in both the federal and state system to toe the constitutional mark. See *Kaufman* v. *United States*, 394 U. S., at 226. However, the opinion in *Kaufman* itself concedes that there is no need to apply new constitutional rules on habeas to serve the interests promoted by that decision. 394 U. S., at 229. Further, as I explain in the margin below,[5] Congress, in at least one significant

---

[4] Arguably, *Reck* v. *Pate*, 367 U. S. 433 (1961), tacitly holds that habeas petitions must be judged in accordance with current law. The Court there directed the issuance of the writ on the ground that petitioner's conviction, which became final in 1936, had been procured by the introduction into evidence of an illegally obtained confession, relying heavily on cases decided by this Court subsequent to 1936. The District Court, in denying relief, had clearly held that the admissibility of his confession was to be judged by standards prevailing in 1936. *United States ex rel. Reck* v. *Ragen*, 172 F. Supp. 734, 745–746 (ND Ill. 1959). However, this choice of law problem was not expressly adverted to and the case arose before this Court produced the recent enlargement of new constitutional rules of criminal procedure.

[5] In 1966, Congress amended the habeas statutes to deal with this Court's discussion in *Sanders* v. *United States*, 373 U. S. 1 (1963), of *res judicata* principles as they apply to habeas corpus. One subsection of that new statute provides:

"In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review . . . of the decision of such State court, shall be conclusive as to all issues of fact or law . . . actually adjudicated by the Supreme Court therein, unless the applicant . . . shall plead and the court shall find the existence of *a material and controlling*

regard, seems plainly to have disapproved the notion that supervening constitutional interpretation ought to apply on habeas involving state convictions.

Clearly, it is at least fair to regard this issue as not yet settled by this Court. Consequently, I go on to inquire how it ought to be resolved. For me, with a few exceptions, the relevant competing policies properly balance out to the conclusion that, given the current broad scope of constitutional issues cognizable on habeas,

---

*fact* which did not appear in the record of the proceeding in the Supreme Court [and could not have been put in by exercising due diligence]." 28 U. S. C. § 2244 (c) (1964 ed., Supp. V) (emphasis added).

Unless one is to read "fact" as including a change in the law, it would seem that Congress has provided in these circumstances for finality as to legal determinations. That "fact" is properly read narrowly seems the better view in light of subsections (a) and (b) which permit a subsequent habeas petition (where there was no Supreme Court review) if it presents a "new ground" or "a factual or other ground not adjudicated on the [prior] hearing." Although the legislative history is extremely sparse, it fully supports this reading. Both the House and Senate committee reports accompanying these amendments stated that the purpose of the reformulation of § 2244 was to introduce a greater measure of finality into the law by providing for a qualified application of the *res judicata* concept. See H. R. Rep. No. 1892, 89th Cong., 2d Sess., 3, 8 (1966); S. Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966). There was no relevant floor debate on these amendments.

Nor do I think the converse inference can properly be drawn that, if Congress provided legal finality for those prisoners whose convictions had been affirmed by us, it intentionally determined that other convicts should be able to avail themselves of all new constitutional rules on habeas. The language of subsections (a) and (b) certainly does not compel such a conclusion. The congressional committee reports neither state nor fairly imply that these amendments were designed to achieve the maximum feasible or desirable finality in habeas proceedings. Most important, it is difficult to imagine what would be the rationale for such a distinction merely between those who have and have not, at some time in the remote past, had full review of their cases in this Court.

it is sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of all these cases on the basis of intervening changes in constitutional interpretation.

I do not mean to neglect the force of countervailing contentions. Assuring every state and federal prisoner a forum in which he can continually litigate the current constitutional validity of the basis for his conviction tends to assure a uniformity of ultimate treatment among prisoners; provides a method of correcting abuses now, but not formerly, perceived as severely detrimental to societal interests; and tends to promote a rough form of justice, albeit belated, in the sense that current constitutional notions, it may be hoped, ring more "correct" or "just" than those they discarded.

In my view, however, these interests are too easily overstated. Some discrimination must always exist in the legal treatment of criminal convicts within a system where the governing law is continuously subject to change. And it has been the law, presumably for at least as long as anyone currently in jail has been incarcerated, that procedures utilized to convict them must have been fundamentally fair, that is, in accordance with the command of the Fourteenth Amendment that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *Twining* v. *New Jersey,* 211 U. S. 78 (1908). Moreover, it is too easy to suggest that constitutional updating is necessary in order to assure that the system arrives only at "correct" results. By hypothesis, a final conviction, state or federal, has been adjudicated by a court cognizant of the Federal Constitution and duty bound to apply it. To argue that a conclusion reached by one of these "inferior" courts is somehow forever erroneous because years later this Court took a different view of the relevant constitutional com-

mand carries more emotional than analytic force. No one has put this point better than Mr. Justice Jackson, in his concurring opinion in *Brown* v. *Allen,* 344 U. S., at 540:

> "[R]eversal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final."

More importantly, there are operative competing policies in this area which I regard as substantial. It is, I believe, a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view. See, *e. g., Fay* v. *Noia,* 372 U. S., at 445 (Clark, J., dissenting); *Spencer* v. *Texas,* 385 U. S. 554, 583 (1967) (Warren, C. J., concurring and dissenting). See also Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441 (1963); Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 146–151 (1970). As I have stated before, "Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community." *Sanders* v. *United States,* 373 U. S., at 24–25 (HARLAN, J., dissenting). At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to

be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. See Friendly, *supra,* at 148–149. This drain on society's resources is compounded by the fact that issuance of the habeas writ compels a State that wishes to continue enforcing its laws against the successful petitioner to relitigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first. See Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 384 (1964).

In sum, while the case for continually inquiring into the current constitutional validity of criminal convictions

on collateral attack is not an insubstantial one, it is by no means overwhelming. Most interests such a doctrine would serve will be adequately protected by the current rule that all constitutional errors not waived or harmless are correctible on habeas and by defining such errors according to the law in effect when a conviction became final. Those interests not served by this intermediate position are, in my view, largely overridden by the interests in finality.

Although not necessary to the resolution of either of the two collateral cases now here, for sake of completeness I venture to add that I would make two exceptions to this general principle. First, the above discussion is written only with new "procedural due process" rules in mind, that is, those applications of the Constitution that forbid the Government to utilize certain techniques or processes in enforcing concededly valid societal proscriptions on individual behavior.[6] New "substantive due process" rules, that is, those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,[7] must, in my view, be placed on a different footing. As I noted above, the writ has historically

---

[6] I have in mind, of course, decisions such as *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Mapp* v. *Ohio*, 367 U. S. 643 (1961); *Miranda* v. *Arizona*, 384 U. S. 436 (1966); *Chimel* v. *California*, 395 U. S. 752 (1969).

[7] For example, *Street* v. *New York*, 394 U. S. 576 (1969); *Stanley* v. *Georgia*, 394 U. S. 557 (1969); *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); *Loving* v. *Virginia*, 388 U. S. 1 (1967). Some rules may have both procedural and substantive ramifications, as I have used those terms here. See, *e. g.*, my discussion, in Part IV-C of this opinion of the divergent ways *Marchetti* v. *United States*, 390 U. S. 39 (1968), and *Grosso* v. *United States*, 390 U. S. 62 (1968), bear on the problems raised by today's Fifth Amendment cases.

been available for attacking convictions on such grounds.[8] This, I believe, is because it represents the clearest instance where finality interests should yield. There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose. Moreover, issuance of the writ on substantive due process grounds entails none of the adverse collateral consequences of retrial I have described above. Thus, the obvious interest in freeing individuals from punishment for conduct that is constitutionally protected seems to me sufficiently substantial to justify applying current notions of substantive due process to petitions for habeas corpus. See generally Part II of my opinion for the Court in *United States* v. *United States Coin & Currency*, *post*, p. 722.

Secondly, I think the writ ought always to lie for claims of nonobservance of those procedures that, as so aptly described by Mr. Justice Cardozo in *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937), are "implicit in the concept of ordered liberty." Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction.

---

[8] See, *e. g.*, *Ex parte Siebold*, 100 U. S. 371 (1880); *Crowley* v. *Christensen*, 137 U. S. 86 (1890); *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886). And see cases collected in Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 384 n. 30 (1964), and the discussion therein of the finality implications such instances present.

For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime. See my separate opinion in *Gideon* v. *Wainwright,* 372 U. S. 335, 349 (1963), where I concurred in conferring this right on a state prisoner, seeking state habeas corpus, on the grounds that this "new" rule was mandated by *Palko.* Hence, I would continue to apply *Gideon* itself on habeas, even to convictions made final before that decision was rendered. Other possible exceptions to the finality rule I would leave to be worked out in the context of actual cases brought before us that raise the issue.

Subsequent reflection upon what I wrote in *Desist,* where I undertook to expose in a preliminary way some of the considerations I thought ought to govern the problem of deciding which, if any, new constitutional rules should be held cognizable in habeas proceedings, leads me to these additional observations. There I tentatively suggested we might apply those new rules that "significantly improve the pre-existing fact-finding procedures" mandated by the Federal Constitution. 394 U. S., at 262. Cf. Mishkin, The Supreme Court 1964 Term—Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 77–101 (1965). As indicated above, I am now persuaded that those new rules cognizable on habeas ought to be defined, not by the "truth-determining" test, but by the *Palko* test. My reasons are several. First, adherence to precedent, particularly *Kaufman* v. *United States,* must ineluctably lead one to the conclusion that it is not a principal purpose of the writ to inquire whether a criminal convict did in fact commit the deed alleged. Additionally, recent decisions of this Court, *e. g., Coleman* v. *Alabama,* 399 U. S. 1 (1970), have revealed just how marginally effective are some new rules purportedly aimed at improving the fact-

finding process. I cannot believe that the interest in finality is always outweighed by the interests protected in cases like *Coleman.* Cf. *Spencer* v. *Texas,* 385 U. S., at 583 (Warren, C. J., concurring and dissenting). I believe *Palko* more correctly marks the tipping point of finality interests, not only in terms of divining which new rules should apply on habeas, but also in its reminder that a particular rule may be more or less crucial to the fairness of a case depending on its own factual setting. Finally, I find inherently intractable the purported distinction between those new rules that are designed to improve the factfinding process and those designed principally to further other values. For a perfect example, note the plurality's difficulty today in explaining, on that basis, retroactivity decisions such as *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Stovall* v. *Denno,* 388 U. S. 293 (1967); and *DeStefano* v. *Woods,* 392 U. S. 631 (1968). *Williams* v. *United States, ante,* at 655–656, n. 7.

Secondly, in *Desist* I went to some lengths to point out the inevitable difficulties that will arise in attempting "to determine whether a particular decision has really announced a 'new' rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." 394 U. S., at 263. See generally *id.,* at 263–269. I remain fully cognizant of these problems and realize they will produce some difficulties in administering the writ, but believe they would be greatly ameliorated by adequate recognition of the principle of finality in the operation of the criminal process.

### III

I realize, of course, that this opinion, which is already unfortunately lengthy, has thus far not been directly responsive to the plurality opinions announced in these

cases. Essentially this is because I do not perceive the issues raised by these cases from the same perspective as my Brethren. Certain aspects of the other opinions announced today do, however, fairly call for a response both because they contain some small seeds of a challenge to what I have said above and because I think, with respect, that what is written today by some of those who would give virtually unlimited sweep to this "retroactivity" doctrine strikingly illuminates the faulty premises of the thinking in this entire field.

In the plurality opinions in *Williams* and *Elkanich,* and *Mackey* the only challenge I perceive to my views is the single assertion that my analysis is untenable because unsupported by precedent. *Williams* v. *United States, ante,* at 651–652. Truly, this is a remarkable claim. For *Linkletter* v. *Walker, supra,* the wellspring of the current retroactivity doctrine, took as its point of departure the very distinction between direct review and collateral attack which I have argued is crucial to any analysis in this field, a distinction which the Court now firmly discards.

Further, as the dissenting opinion in *United States* v. *United States Coin & Currency, post,* at 735, points out, in an analogous situation, the legislative repeal of a criminal statute, "the judge-made rule was that those whose convictions had been finally affirmed when repeal took place received no benefit from the new rule; but repeal of a statute abated pending prosecutions and required reversal of convictions still on appeal when the law was changed." In other words, the precise distinction I have urged between direct review and collateral attack, based not on the nature of the act of changing the law or of the new law thus pronounced but, instead, on the nature of the adjudicatory context in which the claim of legal error was presented has consistently

been the model for the judicial process. Indeed, it would seem that the only precedential support for the position that prevails today is that conflicting and confusing flurry of "retroactivity" opinions that commenced less than five years ago with *Johnson* v. *New Jersey*, 384 U. S. 719 (1966).

Other aspects of the dissent in *Coin & Currency*, *supra*, might, it seems to me, be construed as a further challenge to the views I have expressed here since that opinion is subscribed to by a majority of those members of the Court who have determined that, for purposes of deciding whether new search and seizure rules apply to subsequent cases arising in federal courts, the process invoked by the litigants is irrelevant. In any event, I find the implications of the analysis underlying that dissent startling. For example, that Congress currently provides that statutory repeal shall not abate pending prosecutions or require reversal of nonfinal convictions seems to me a singularly unhelpful bit of information. We sit as a court of law, not a council of revision. Our powers of judicial review are judicial, not legislative, in nature. The assertion that this evidence is relevant data for resolving the problems at hand serves at best only to make explicit that which I have attempted to demonstrate in Part I of this opinion—that the retroactivity analysis currently ascendant in this Court proceeds on the false and unacceptable premise that constitutional interpretation is not purely a judicial, but, rather, something akin to a legislative, process. If, in fact, that premise is true we ought not to be writing retroactivity opinions but instead relinquishing some of our powers of judicial review.

The dissenting opinion attempts to palliate its invocation of the legislative process by alternately suggesting that the typical statutory rule is, because widespread, part

of our fabric of "positive law" and the issue, therefore, is whether this Court should carry this policy over to the realm of constitutional interpretation. Three cases are cited that allegedly reveal we are not foreclosed from taking this course. The short answer to all this remains the same: the distinction between judicial and legislative power is equally woven deeply into the fabric of our positive law. So, too, is the notion that this Court definitively interprets the Constitution only because its role as a court of law requires it to do so. It is not surprising, then, to discover upon closer analysis that the cited cases do not bear the heavy weight placed on them. *Gelpcke* v. *City of Dubuque,* 1 Wall. 175 (1864), holds only that *state* courts may be *compelled* in some situations by particular provisions of *the Federal Constitution* to apply certain new rules prospectively only. No such claim has ever been made about these new constitutional rules of criminal procedure. *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 U. S. 358 (1932), merely holds that the Federal Constitution imposes no barrier to a state court's decision to apply a new state common-law rule prospectively only. Is it not sufficient answer to the dissenters' final assertion of precedential support to point out that *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371 (1940), was a collateral attack on a civil judgment already otherwise final and entitled to *res judicata* effect? And, further, that it was written by the same Chief Justice, Hughes, who had held six years earlier in *United States* v. *Chambers,* 291 U. S. 217 (1934), that repeal of the Eighteenth Amendment abated all prosecutions begun, and required reversal on direct review of all convictions obtained, under statutes dependent for their constitutionality on the repealed amendment, yet did not affect final convictions so obtained?

## IV

Because my comprehension of the relevant issues diverges so substantially from that of the Court it is necessary for me to discuss separately my view as to the proper disposition of each of these three cases.

## A

*Williams* v. *United States* (direct review). As this case is here on direct review, I would apply to its resolution the rule enunciated in *Chimel* v. *California*, 395 U. S. 752. The plurality correctly describes the salient facts in this case at n. 2 of its opinion, *ante,* at 650–651, and I agree they plainly reveal a violation of *Chimel*. Indeed, the Ninth Circuit panel below, although it held *Chimel* nonretroactive, explicitly found the search here involved inconsistent with the dictates of *Chimel*. 418 F. 2d 159, 161 (CA9 1969). Consequently, I would reverse the judgment below and remand with instructions to vacate the judgment of conviction.

## B

*Elkanich* v. *United States* (collateral review). I agree, but for wholly different reasons, with the Court's view, expressed in n. 2 of its opinion, *ante,* at 651, that we need not evaluate the search of Elkanich's apartment in light of the precepts of *Chimel*. His conviction became final five years prior to *Chimel's* promulgation, and prevailing law at that time certainly validated the search here involved. See *United States* v. *Rabinowitz,* 339 U. S. 56 (1950), and *Harris* v. *United States,* 331 U. S. 145 (1947). An appraisal of the facts surrounding this search leads me quite easily to conclude that the procedures used in obtaining this conviction were not so fundamentally devoid of the necessary elements of pro-

cedural due process as to require upsetting this conviction in spite of the fact that it was perfectly lawful when made final. The agents here clearly had probable cause to arrest petitioner, were not undertaking a fishing expedition for any evidence they might find but, rather, were looking for specific items that they had reason to believe might be concealed in various places around the premises and, indeed, generally limited their search to areas indicated by petitioner. I would affirm the judgment below.

## C

*Mackey* v. *United States* (collateral review). Petitioner in this case seeks relief from confinement by way of habeas. At his trial for evading payment of income taxes, part of the Government's case in chief consisted of the introduction of 60 wagering excise tax returns. At the time his conviction became final in 1965, the introduction of these statements would have been permissible under the authority of *United States* v. *Kahriger,* 345 U. S. 22 (1953). I find it unnecessary to inquire whether it inevitably follows from the new rule enunciated in *Marchetti* and *Grosso* that such a procedure would today be held an unacceptable abridgment of petitioner's Fifth Amendment right to be free of compulsory self-incrimination. For, even assuming the latter cases, if applicable, would produce a different result, I cannot conclude that this change in the law would be sufficient to entitle petitioner to the issuance of a writ of habeas corpus.

Mackey is not asserting that the conduct for which he is being punished, evading payment of his federal income taxes, has been held to be constitutionally immune from punishment. In this regard, Mackey's claim differs from that raised by the respondent in *Coin & Currency,* also decided today, where *Marchetti* and *Grosso* do operate to render Congress powerless to punish

the conduct there at issue. Instead, Mackey's claim is that the procedures utilized in procuring his conviction were vitiated by the *Marchetti* and *Grosso* decisions. Since matters of procedure rather than substance are involved, see Part II of this opinion, I would apply to the resolution of this habeas petition the law in effect at the time Mackey's conviction became final, absent a showing that the procedures employed were fundamentally unfair. While *Kahriger* did indeed, in my judgment, rest upon an "excessively narrow" view of the scope of the privilege against self-incrimination, I cannot say that hindsight reveals that judgment to have been so grossly erroneous as to amount to the perpetration of an inexcusable inequity against Mackey in these circumstances. Despite our rejection of it as a matter of Fifth Amendment policy, the prior justification of the Government's activity in this area—that persons affected could avoid incrimination by ceasing to engage in illegal activities—is not without some force.

Although the question is, for me, not free of difficulty, I would affirm the judgment below for the reasons stated above.

## V

In conclusion, the Court in deciding these cases seems largely to have forgotten the limitations that accompany its functions as a court of law. For the retroactivity doctrine announced today bespeaks more considerations of policy than of legal principle. Treating direct and collateral review as if they were of one piece seems to me faulty analysis, ignoring, as it does, the jurisprudential considerations that differentiate the two kinds of adjudicatory functions. As a court of law we have no right on direct review to treat one case differently from another with respect to constitutional provisions applicable to both. As regards cases coming here on collateral review, the problem of retroactivity is in truth

none other than one of resettling the limits of the reach of the Great Writ, which under the recent decisions of this Court has been given almost boundless sweep.[9] Until the Court is prepared to do this I can see no really satisfactory solution to the retroactivity problem. Meanwhile, I very much regret to see the existing free-wheeling approach to that problem now rewritten into the jurisprudence of this Court.

I would affirm the judgments in Nos. 36 and 82 and reverse the judgment in No. 81 upon the premises discussed in this opinion.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

Three years ago we held that the federal wagering tax statutes, 26 U. S. C. § 4401 *et seq.*, subjected those to whom they applied to such a real and substantial danger of self-incrimination that those statutes could "not be employed to punish criminally those persons who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination." *Marchetti* v. *United States,* 390 U. S. 39, 42 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968). This case presents the question what, if any, use the Government is entitled to make of wagering excise tax returns, filed pursuant to the statutory scheme, in a prosecution for income tax evasion. Since I believe the Fifth Amendment does not prevent the use of such returns to show a likely source of unreported income in a criminal prosecution for income tax evasion, I concur in the judgment of the Court.[1]

---

[9] For example, though correct in its result, I am now of the view that *Linkletter* would have been better decided had it simply held that federal habeas corpus does not lie for claimed errors in the introduction of illegally seized evidence.

[1] This view of the case makes it unnecessary for me to decide whether petitioner's conviction should be examined without regard

## I

The relevant facts may be briefly stated. As required by statute, petitioner from 1956 through 1960 filed monthly wagering excise tax returns showing his name, address, and the gross amount of wagers accepted by him during the month in question.[2] He was subsequently indicted for willfully attempting to evade payment of his income taxes for those years. 26 U. S. C. § 7201. At trial, the Government used the wagering tax returns to show that the gross amount of wagers reported, less the expenses of petitioner's business as reported on his annual income tax returns, was greater than the profits from gambling reported on those same annual returns. The Court of Appeals affirmed over petitioner's claim that the returns were inflammatory, prejudicial, and irrelevant. 345 F. 2d 499 (CA7 1965). After our decisions in *Marchetti* v. *United States, supra,* and *Grosso* v. *United States,' supra,* petitioner filed an application for postconviction relief on the ground that use of the wagering tax returns was barred by the Fifth Amendment. The application was denied by the District Court in an unreported opinion, and the denial was affirmed by the Court of Appeals. 411 F. 2d 504 (CA7 1969).

## II

At first glance, petitioner's argument appears compellingly simple. Since the information required of him under the federal wagering tax statutes presented a real and substantial danger of subjecting him to criminal prosecution for his gambling activities, the Government

---

to the standards embodied in *Marchetti* and *Grosso*. The balance of this opinion is written on the assumption that *Marchetti* and *Grosso* are applicable.

[2] See 26 U. S. C. § 6011 (a); Treas. Reg. § 44.6011 (a)–1 (a), 26 CFR § 44.6011 (a)–1 (a).

lacked the power to compel the information absent a waiver of his Fifth Amendment privilege unless it provided the necessary immunity from prosecution. *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968); *Heike* v. *United States,* 227 U. S. 131, 143–144 (1913); *Counselman* v. *Hitchcock,* 142 U. S. 547, 584–586 (1892). Since petitioner filed the wagering tax returns under threat of criminal prosecution for failure to do so, 26 U. S. C. § 7203, and since he never knowingly waived his Fifth Amendment privilege, see *Grosso* v. *United States, supra,* at 70–71, he is entitled to the immunity required by the Fifth Amendment. *Adams* v. *Maryland,* 347 U. S. 179, 181 (1954). Therefore, petitioner argues, the Government was foreclosed from using the information provided by him on the wagering tax returns against him in a criminal prosecution for evasion of the income tax.

But in *Marchetti* and *Grosso,* we dealt with the question whether, in light of possible uses of testimonial evidence sought to be compelled over a claim of privilege, the Fifth Amendment allows the individual concerned to withhold the evidence without penalty. In the present case, however, we deal with the scope of immunity required when the privilege is claimed and the evidence is nevertheless compelled. This distinction, in my view critical, is overlooked by petitioner. Where testimony has been refused, adjudication of necessity must take place in something of a vacuum. Although an individual may not "draw a conjurer's circle around the whole matter" by refusing to provide any explanation why the information sought might be incriminating, *United States* v. *Sullivan,* 274 U. S. 259, 264 (1927), he need not provide the incriminating evidence in order to demonstrate that the privilege was validly invoked, *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951). In such circumstance, sanctions may be applied for re-

fusal to testify only if it is " *'perfectly clear,* from a careful consideration of all the circumstances in the case . . . that the answer[s] *cannot possibly* have [a] tendency' to incriminate." *Id.,* at 488, quoting *Temple* v. *Commonwealth,* 75 Va. 892, 898 (1881) (emphasis in original).

But where the individual has succumbed to compulsion and provided the information sought, finer analytical tools may be employed. "A factual record showing, for example, the substance of the individual's compelled testimony, the way that testimony was subsequently used by the prosecutor, and the crime for which the individual was ultimately prosecuted, provides important considerations to anchor and inform the constitutional judgment." *Piccirillo* v. *New York,* 400 U. S. 548, 558 (1971) (BRENNAN, J., dissenting). Thus, even when the privilege against self-incrimination permits an individual to refuse to answer questions asked by the Government, if false answers are given the individual may be prosecuted for making false statements. *United States* v. *Knox,* 396 U. S. 77, 80–83 (1969).

The flaw in petitioner's argument lies in its misunderstanding of *Marchetti* and *Grosso* as applied to a situation where testimonial evidence has been compelled over a claim of privilege. For we did not, in those cases, cast any doubt upon the power of the United States to impose taxes on unlawful, as well as on lawful activities. 390 U. S., at 44; see *United States* v. *Sullivan,* 274 U. S., at 263. Nor did we suggest that the Fifth Amendment would make it impossible for Congress to construct an enforceable statutory scheme for reporting by individuals of their illicit gains. See 390 U. S., at 72 (BRENNAN, J., concurring). Rather, we noted that "[t]he laws of every State, except Nevada, include broad prohibitions against gambling, wagering, and associated activities," and that even Nevada imposed

"criminal penalties upon lotteries and certain other wagering activities taxable under [the federal] statutes." *Id.*, at 44–46. We noted that federal statutes prohibit the use of the mails and of interstate commerce for many activities ancillary to wagering.[3] *Id.*, at 44. On that basis we concluded that "throughout the United States, wagering is 'an area permeated with criminal statutes,' and those engaged in wagering are a group 'inherently suspect of criminal activities.' *Albertson* v. *SACB*, 382 U. S. 70, 79." *Marchetti*, 390 U. S., at 47. Accordingly, registration and payment of the occupational tax, or the filing of a wagering excise tax return that the Government required as a prerequisite to payment of the excise tax,[4] would subject the individual concerned to " 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination." *Id.*, at 48; *Grosso*, 390 U. S., at 64–67. Since we found the "required records" doctrine of *Shapiro* v. *United States*, 335 U. S. 1 (1948), inapplicable to the statutory requirement that a gambler admit his present or future involvement in gambling activity, *Marchetti*, 390 U. S., at 55–57; *Grosso*, 390 U. S., at 67–69, we held that the privilege against self-incrimination was available to the petitioners as a defense to prosecution for failure to register for, report, or pay the federal wagering taxes.[5]

---

[3] See 18 U. S. C. § 1084 (interstate transmission of wagering information), §§ 1301–1304 (conduct of lotteries by mails or broadcasting), § 1952 (interstate travel in aid of, *inter alia*, gambling), § 1953 (interstate transportation of wagering paraphernalia).

[4] We were informed by the United States in *Grosso* that the wagering excise tax would not be accepted unless accompanied by the required return. 390 U. S., at 65.

[5] In addition, we declined in both *Marchetti* and *Grosso* the Government's invitation to salvage the statutory scheme by imposing use restrictions on the information required. *Marchetti*, 390 U. S., at 58–60; *Grosso*, 390 U. S., at 69. The relevance of this to the issue before us is discussed *infra*, at 711–713. For the moment

Had the present case arisen in the context of a federal investigation designed simply to uncover evidence of criminal activity, we would need to go no further.[6] In such a situation, petitioner would be entitled to "absolute immunity . . . from prosecution [under federal laws] for any transaction revealed in that testimony." *Piccirillo* v. *New York,* 400 U. S., at 562 (BRENNAN, J., dissenting); *Counselman* v. *Hitchcock,* 142 U. S., at 584–586. But although we recognized in *Marchetti* that "Congress intended information obtained as a consequence of registration and payment of the [gambling] occupational tax to be provided to interested prosecuting authorities," *Marchetti,* 390 U. S., at 58–59,[7] we nevertheless concluded that the "United States' principal interest is evidently the collection of revenue, and not the punishment of gamblers." *Id.,* at 57; see *United States* v. *Calamaro,* 354 U. S. 351, 358 (1957).

This dual purpose is significant here. For while the Government may not undertake the prosecution of crime by inquiring of individuals what criminal acts they have lately planned or committed, it may surround a taxing or regulatory scheme with reporting requirements de-

---

it is sufficient to note that even the imposition of use restrictions could not have saved the convictions at issue in those cases, for the petitioners obviously had no way of knowing, when they failed to register and file the required forms, that use restrictions might be imposed. See *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 79–80 (1964); *Reina* v. *United States,* 364 U. S. 507, 514–515 (1960).

[6] See n. 1, *supra.*

[7] In *Grosso,* we remarked that "although there is no statutory instruction, as there is for the occupational tax, that state and local prosecuting officers be provided listings of those who have paid the excise tax, neither has Congress imposed explicit restrictions upon the use of information obtained as a consequence of payment of the tax," and that the Revenue Service in fact disseminated such information to "interested prosecuting authorities." *Grosso,* 390 U. S., at 66.

signed to insure compliance with the scheme. See *Marchetti*, 390 U. S., at 44, 60; *Grosso*, 390 U. S., at 72–74 (concurring opinion). In the latter situation, the privilege may not be claimed if the danger of incrimination is only that the information required may show a violation of the taxing or regulatory scheme. Thus in *Shapiro* v. *United States*, 335 U. S. 1 (1948), we upheld a conviction based upon records of sales provided under compulsion of a regulation under the Emergency Price Control Act, 56 Stat. 23. The privilege had been claimed on the basis that the records would (as they did) provide evidence of a violation of the Act. We rejected the claim, reasoning that the Government has power to compel " 'suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established.' " *Id.,* at 33.[8] And in *United States* v. *Sullivan*, 274 U. S. 259 (1927), we rejected a claim that the privilege against self-incrimination allowed an individual whose income was earned in crime to file no form of income tax return whatsoever. Although dubious, we noted the possibility that the privilege could be claimed to excuse reporting the amount of income earned because that alone would disclose the criminal activities that had produced the income. *Id.,* at 263–264. But neither in *Sullivan* nor in any other of our cases is there the slightest suggestion that an individual may refuse to disclose the income he has earned solely because such disclosure will indicate a failure to pay the taxes imposed on that income.

Of course, the Government may not insulate inquiries designed to produce incriminating information merely by

---

[8] The regulation upheld in *Shapiro* required only the keeping of records, and not their reporting; the information there was compelled pursuant to an administrative subpoena. But as we noted in *Marchetti*, this situation is constitutionally indistinguishable from a simple reporting requirement. 390 U. S., at 56 n. 14.

labeling the inquiry a necessary incident of a regulatory scheme. Where the essence of a statutory scheme is to forbid a given class of activities, it may not be enforced by requiring individuals to report their violations. See *Marchetti, supra; Haynes* v. *United States,* 390 U. S. 85 (1968); *Albertson* v. *SACB,* 382 U. S. 70 (1965). But where the statutory scheme is not designed to forbid certain acts, but only to require that they be done in a certain way, the Government may enforce its requirements by a compulsory scheme of reporting, directed at all who engage in those activities, and not on its face designed simply to elicit incriminating information. *Shapiro* v. *United States, supra;* see *Albertson* v. *SACB, supra,* at 77–80.

Viewed in this light, then, *Marchetti* and *Grosso* are the outgrowth of two principles inapplicable to the problem at hand. The first is that when a given class of activities is, in the main, made criminal by either state or federal law, an individual may not be compelled to disclose whether he engages in activities within the class unless his disclosure is compensated by the requisite grant of immunity.[9] *Marchetti, supra; Haynes* v. *United States, supra; Albertson* v. *SACB, supra.* The second is that such individuals may likewise not be compelled, absent sufficient immunity, to disclose the details of their activities within such a suspect class: for if the mere admission of engaging in any of a class of activities is sufficiently likely to lead to criminal prosecution that the privilege against self-incrimination may be invoked,

---

[9] Since the statutory scheme in *Marchetti* and *Grosso* provided no immunity whatsoever, and since those cases arose in the context of an attempt by the Government to punish individuals for failure to disclose the information requested, we had no occasion there to determine the precise scope of the immunity that would be required to displace the privilege.

admission of the details of these activities is *a fortiori* likely to lead to incrimination. *Grosso, supra.*

Neither of these principles, however, controls the case at hand. The relevant class of activities "permeated with criminal statutes," *Albertson* v. *SACB,* 382 U. S., at 79, is the class of activities related to gambling. But this case does not involve a prosecution for gambling or related activities. It involves a prosecution for income tax evasion, by use of information compelled pursuant to a scheme requiring all those who engage in the business of accepting wagers [10] to report their income twice. For the reasons discussed above, the Government may validly enforce the tax laws by a scheme of required reports, directed at all persons engaging in certain types of activity, and requiring them to report the amount of their income so that the Government may insure that the requisite taxes have been paid. If such a reporting requirement raises a substantial danger of incrimination under state or federal statutes making criminal the activity that is being taxed, an individual may, of course, assert the privilege against self-incrimination and refuse to disclose the information sought. We so held in *Marchetti* and *Grosso.* And if the information has been compelled over a claim of privilege, application of those cases requires that the individual be protected against the use of that information in state prosecutions under the statutes making criminal the taxed activity, and to complete immunity from prosecution under federal statutes of like kind. *Piccirillo* v. *New York,* 400 U. S., at 561–574 (BRENNAN, J., dissenting); *Adams* v. *Maryland,* 347 U. S., at 181; *Counselman* v. *Hitchcock,* 142 U. S., at 584–586; cf. *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 79, and n. 18 (1964). He is, in short, entitled to the protection

---

[10] The few exceptions to this requirement are noted in *Marchetti,* 390 U. S., at 42.

required by the Fifth Amendment. But here the Government was entitled to demand the information that petitioner supplied—his gross income from wagering—in order to enforce the tax laws. Petitioner was entitled to claim the privilege only because of the possibility of prosecution under state or federal gambling laws. No such prosecution is involved here. "Once the reason for the privilege ceases, the privilege ceases." *Ullmann* v. *United States,* 350 U. S. 422, 439 (1956). Since the United States was entitled to demand the information at issue here for the purpose to which it was eventually put, the danger that petitioner's disclosures might also have been impermissibly used does not prevent their present, legitimate use even though the danger of impermissible use would justify refusal to provide the information at all.[11]

## III

Finally, our decisions in both *Marchetti* and *Grosso* not to attempt to salvage the statutory scheme by imposing

---

[11] The filing of a wagering tax return (or registration as a prospective gambler) necessarily involves an admission that one has engaged in, or intends to engage in gambling. Since gambling and related activities are very likely to be criminal under state or federal law, the Government lacks power to compel such an admission absent the requisite grant of immunity. This was the question involved in *Marchetti* and *Grosso*. But what is relevant to the present case is not whether petitioner was involved in criminal activity, but whether he paid the taxes imposed on his income. I have indicated above why I believe that the Government may enforce an otherwise unobjectionable scheme designed to insure that individuals report the amount of their income in order to enforce the tax laws. It therefore follows that the registration and reporting requirements of the federal wagering tax statutes could properly be enforced under a statute granting those who complied with the requirements immunity from prosecution under federal statutes that outlaw gambling and related activities, and protection against the use of information contained in the returns in aid of prosecution under state or federal laws making such activities criminal.

use restrictions do not require that, once evidence has actually been compelled, we refuse to protect a valid governmental interest by restricting use of that evidence any more than is required by the Fifth Amendment. For although we recognized in *Marchetti* that "the imposition of use-restrictions would directly preclude effectuation of a significant element of Congress' purposes in adopting the wagering taxes," 390 U. S., at 59, the primary basis for our refusal to impose such restrictions was that "the imposition of such restrictions would necessarily oblige state prosecuting authorities to establish in each case that their evidence was untainted by any connection with information obtained as a consequence of the wagering taxes; the federal requirements would thus be protected only at the cost of hampering, perhaps seriously, enforcement of state prohibitions against gambling." *Ibid.*[12] Since a balance between effective state enforcement of gambling laws and the interests of the federal treasury was one to be struck by Congress, and not this Court, we declined to impose the proposed restrictions. *Id.,* at 59–60. And in *Grosso,* we merely noted that it would be "inappropriate to impose such restrictions upon one portion of a statutory system, when we have concluded that it would be improper, for reasons discussed in *Marchetti,* to do so upon 'an integral part' of the same system." 390 U. S., at 69. Once again, however, different considerations apply when the question is not whether information may be compelled but rather to what uses compelled information may be put. Once the return has

---

[12] That this was the primary basis for our refusal is evidenced by our recognition that the "United States' principal interest is evidently the collection of revenue, and not the punishment of gamblers." 390 U. S., at 57. Absent the necessity for balancing state and federal interests, we would surely not have crippled the primary purpose of the statutes because a secondary purpose was necessarily disabled.

been filed, prosecution under state gambling laws can take place only if the State can demonstrate that its evidence is not tainted by information derived from the incriminatory aspects of the return. Since disclosure once made may never be completely undone, this burden must be borne by the State regardless of what additional restrictions are imposed upon use of the return. Accordingly, the considerations that led us to decline the imposition of use restrictions for the future in *Marchetti* and *Grosso* are not compelling in situations where the incriminating information has already been disclosed. Petitioner is therefore entitled to the immunity required by the Fifth Amendment, and to no more. Since I believe the Amendment is no bar to the use to which his wagering tax returns were put, I concur in the judgment of the Court.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

I had assumed that all criminal and civil decisions involving constitutional defenses which go in favor of the defendant were necessarily retroactive. That is to say, the Constitution has from Chief Justice Jay's time been retroactive,* for there were no decisions on the points prior thereto. *Marchetti* v. *United States,* 390 U. S. 39, and *Grosso* v. *United States,* 390 U. S. 62, exonerated defendants who, when they failed to file returns, were not by reason of *United States* v. *Kahriger,* 345 U. S. 22, entitled to a constitutional immunity. Why Marchetti and Grosso are entitled to relief and Mackey is not, is a mystery. It is said that Mackey's gambling return, "like physical evidence seized in violation of a new interpretation of the Fourth Amendment, is concededly relevant and probative even though obtained by

---

*See *Chisholm* v. *Georgia,* 2 Dall. 419.

the Government through means since defined by this Court as constitutionally objectionable." The same could be said of Marchetti and Grosso. Yet their convictions were reversed.

I could understand today's decision if *Marchetti* and *Grosso* had announced only a prospective rule applicable to all like defendants. But when the defendants in those cases are given the benefit of a new constitutional rule forged by the Court, it is not comprehensible, if justice rather than the fortuitous circumstances of the time of the trial is the standard, why all victims of the old unconstitutional rule should not be treated equally.

I can find nothing in the Constitution that authorizes some constitutional rules to be prospective and others to be retroactive. The majority often says the test is whether a new rule affects the integrity of the factfinding process, *Desist* v. *United States,* 394 U. S. 244. Yet even that test is not applied when the majority thinks that the impact of the new rule, if applied with due regard to the Equal Protection Clause, would be "devastating." *Tehan* v. *Shott,* 382 U. S. 406, 419. The Constitution grants this Court no such legislative powers.

My views have been expressed in *Linkletter* v. *Walker,* 381 U. S. 618, 640, and *Johnson* v. *New Jersey,* 384 U. S. 719, 736, and I adhere to them. I would continue to construe all constitutional safeguards "strictly."