Walter ASH, Plaintiff,

v.

Edward F. REILLY, Jr., Cranson J. Mitchell, John Simpson, In their official capacities as Commissioners of the United States Parole Commission

Odie Washington, In his official capacity as Director of the District of Columbia Department of Corrections

Fred Figueroa, In his official capacity as Warden of the Correctional Treatment Facility, Defendant.

Civil Action No. 03–2007 (RMU)(AK).

United States District Court, District of Columbia.

Jan. 31, 2005.

Olinda Moyd, Catharine F. Easterly, Timothy Patrick O'Toole, Washington, DC, for Plaintiff.

Daniel M. Cisin, Margaret J. Chriss, U.S. Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KAY, United States Magistrate Judge.

Pending before the Court is Respondent's Motion, pursuant to Rule 59(e) to Reconsider the Court's December 7, 2004 Memorandum Order, the Petitioner's Opposition thereto, and the Respondent's subsequent Reply. For the reasons set forth below, the Respondent's Motion is **DENIED.** Additionally, pursuant to Rule 58 of the Federal Rules of Civil Procedure, a separate Order accompanies this Memorandum Opinion.

The government makes two arguments in support of its position. First, according to the government, this Court was barred, by the rule against retroactivity, from applying *Crawford v. Washington*, to the present case. Second, according to the government, *Morrissey v. Brewer* does not support the position as stated by this Court. The Court rejects these arguments, as discussed below.

## I. MORRISSEY

 Pretermitting the applicability of the non-retroactivity doctrine to the case at hand, this Court would, nevertheless, reach the same result relying solely on *Morrissey.*

As this Court stated in its December 7, 2004 Memorandum Order, "the only unequivocal pronouncement regarding parole revocation hearings is that the right to confrontation is a minimum requirement of due process." *Ash v. Reilly,* 354 F.Supp.2d 1, 7–8, 2004 WL 2800937, *6 (D.D.C.2004), *citing Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). This Court's reliance on *Morrissey,* in its Memorandum Order cannot be overstated. "Even if the holding in *Crawford v. Washington* does not apply . . . this Court would need to define 'confrontation' as stated by the *Morrissey* Court as a minimum requirement of due process." *Ash,* at 9, 2004 WL 2800937, *7. The Court's exposition of the right to confrontation, as required for parole revocation hearings under *Morrissey,* looks to *Crawford v. Washington,* because there, "the Court discusses at length the etymology of the right to confrontation and *restates* its importance in the fundamental fairness of criminal trials in our nation." *Id.* at 9, 2004 WL 2800937, *8. Nowhere in the Court's opinion does it state that it relies, or applies, the holding of *Crawford v. Washington* to the case at hand, but that it "turn[s] to the same sources as cited in *Crawford v. Washington.*" *Id.*

The government claims that the Court improperly applied 6th Amendment jurisprudence to the case at hand. (Motion at 12, *citing Maddox v. Elzie,* 238 F.3d 437 (D.C.Cir.2001)). In *Maddox,* the Court held that a district court's application of 6th Amendment jurisprudence to a parole revocation hearing case was improper. *See id.* Unlike *Maddox,* here, the Court is not in a position, nor has it, decided whether confrontation applies to criminal defendants in parole revocation hearings. That

question has been settled previously, and in the affirmative, by the Supreme Court in *Morrissey,* a holding this Court is bound to follow.

The government also cites *Hyser v. Reed,* 318 F.2d 225 (D.C.Cir.1963) in support of its position that the 6th Amendment does not apply to criminal defendants in parole revocation hearings. (Motion at 12–14.) *Hyser* dealt with the right in parole revocation hearings to appointed counsel. The *Morrissey* Court explicitly excluded this very issue from its decision. *Morrissey,* 408 U.S. at 488, 489, 92 S.Ct. 2593 (1972). The *Morrissey* Court, however, explicitly provide that criminal defendants in parole revocation hearings have a right to confrontation. Therefore, unlike in *Hyser,* in which the district court extended 6th Amendment jurisprudence to the parole revocation context in its case, here, the Court is merely applying already existent jurisprudence to the facts before it.

This Court did turn to *Crawford v. Washington* for assistance in the exposition of the meaning and contours of the right to confrontation. Yet the reference to it served as a shortcut to the "history underlying the common-law right of confrontation," which both had been used by the Supreme Court in *Crawford,* and is used by this Court, by reference, in defining 'confrontation.' *Crawford,* 541 U.S. 36, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177. In *Crawford,* the Court was concerned with the meaning of 'confrontation' as found in the 6th Amendment. *See id.* In the case at hand, this Court is concerned with the meaning of 'confrontation' as found in *Morrissey v. Brewer.* Thus, the Supreme Court's definition of 6th Amendment 'confrontation' in *Crawford* is akin to this Court's understanding of *Morrissey* 'confrontation' not because the former informed the latter, but because they both

are derived from a common source and history.

Therefore, assuming *arguendo* that this Court is not free to apply *Crawford v. Washington* because to do so would violate the prohibition on the retroactive application of new rules of criminal procedure, this Court would reach the same result solely through reliance on the language in *Morrissey,* that, at a constitutional minimum, parole hearing defendants have the right to confront adverse witnesses and through the historical meaning ascribed that term. This Court's decision in this regard is neither "broad" nor "unqualified" as the government suggests. (Motion at 14, 16.) To the contrary, this Court explicitly declined to fully expound the contours of the right to confrontation in the parole revocation context, but stated merely that where, as here, "un-confronted testimonial evidence comprises the *sole* basis of a decision to revoke a criminal defendant's parole, thereby implicating liberty interests, that defendant has been afforded no opportunity for confrontation." *Ash,* at 10, 2004 WL 2800937 at *9.

## II. RETROACTIVITY

The government argues that this Court may not apply the holding in *Crawford v. Washington* to the case presently before the Court because the Supreme Court's decision in that case post-dated the parole revocation hearing here at issue. (Motion at 4–5.) The government is correct that *Teague v. Lane* prohibits this Court, and any court, from applying new rules of criminal procedure retroactively. The government is incorrect that this Court has done so. 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)

The Court must first discuss the prohibition on the retroactive application of new rules of criminal procedure, and whether,

and to what extent, that prohibition applies to the case at hand.

In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held that new rules of criminal procedure should not be applied retroactively, that is, to cases that have become final before the new rule existed. That decision was based on the importance in the finality of judgements, the costs associated with retroactive application, and the concern that without finality, "the criminal law is deprived of much of its deterrent effect." *Id.,* 489 U.S. at 309, 109 S.Ct. 1060.

■ *Teague* makes clear that 'finality' is a threshold inquiry for a determination of retroactivity. *Teague,* 489 U.S. at 295–296, 109 S.Ct. 1060. That is to say, a Court may not apply a decision rendered after the case at hand had become 'final.' Retroactivity jurisprudence does not define with precision what 'final' means in this context. Simply, the Court has said, a case is final " 'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before' " the new decision. *Teague,* 489 U.S. at 295, 109 S.Ct. 1060, *citing Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

Historically, the question of finality in a particular case could be determined by inquiring into whether the reviewing court had the case on direct review or collateral review. *See Desist v. United States,* 394 U.S. 244, 260, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)[1]; *See also Williams v. United States,* 401 U.S. 667, 91 S.Ct. 1171, 28 L.Ed.2d 404 (1971) (Harlan, J., dissenting). If a case was on direct review, a court had the obligation to

apply the law as it was at that time. *Id.,* 401 U.S. at 681, 91 S.Ct. 1160. If a case was before a court on collateral review, on the other hand, the court was obliged to apply the constitutional standards "that prevailed at the time the original proceedings took place." *Desist,* 394 U.S. at 263, 89 S.Ct. 1030 (Harlan, J., dissenting).

A thorough inspection of the development of retroactivity jurisprudence, the expanding availability of habeas relief for criminal defendants, and fundamental notions of independent judicial review make clear that the case at hand is not 'final' nor collateral, although it is before this Court on a writ of habeas corpus.

Two developments in criminal procedure necessitated the development of a doctrine prohibiting the application of new rules to previously finalized cases. First, the retroactivity doctrine, "was the product of the Court's disquietude with the impacts of its fast-moving pace of constitutional innovation in the criminal field." *Williams,* 401 U.S. at 676, 91 S.Ct. 1171 (Harlan, J., dissenting). This rapid expansion of the rights afforded criminal defendants would potentially upset the judiciary's ability to litigate matters and, "at some time provide a definitive answer to the question litigants present." *Id.,* 401 U.S. at 691, 91 S.Ct. 1160. Coterminous with this change came an expansion of the availability of habeas corpus for criminal defendants. *See id.* These developments "opened the door for large numbers of prisoners to relitigate their convictions each time a 'new' constitutional rule was announced" by the Court. *Id.* With these innovations came claims by criminal defendants challenging "the validity under present law of criminal convictions that were perfectly free from error

---

1. Justice Harlan's position in the pre-*Teague* retroactivity cases was adopted by the Court in *Teague.* It is for this reason that this Court looks to Justice Harlan's dissenting opinions

for an exposition of the historical development of retroactivity jurisprudence, for it is in his opinions that the current prevailing position materialized.

when made final." *Id.*, 401 U.S. at 691, 91 S.Ct. 1171. Justice Harlan characterized the need for a coherent retroactivity doctrine as "a matter of the greatest importance if the integrity of the federal judicial process is to be maintained in this era of increasing rapid constitutional change." *Id.*, at 262, 89 S.Ct. 1030. The importance of a retroactive doctrine was stated by Justice Harlan in this way:

"There are operative competing policies in this area which I regard as substantial. It is, I believe, a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view.... Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved. A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final."

*Id.*, at 689–690, 91 S.Ct. 1171.

Another co-existent fundamental constitutional value at issue in Justice Harlan's opinions on retroactivity is the "awesome power of judicial review, this duty to bind coordinate branches of the federal system with our view of what the Constitution dictates." *Id.*, at 678, 91 S.Ct. 1171. This duty represents the fundamental importance of "anti-majoritarian judicial control over the content of our legal system" and a reaffirmation that " 'it is emphatically the province and duty of the judicial department to say what the law is.' " *Id., citing Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–178, 2 L.Ed. 60 (1803).

To balance these two fundamental imperatives, Justice Harlan set forth the notion of retroactivity later adopted by the Court in *Teague v. Lane. See Williams*, 401 U.S. 667, 91 S.Ct. 1171, 28 L.Ed.2d 404. That doctrine held that courts hearing cases on direct review remained free to apply the criminal procedure as it then existed, but that in cases on collateral review, the courts must apply the criminal procedures that had existed prior to the case becoming final. *See Williams*, 401 U.S. 667, 91 S.Ct. 1171 (1971) (Harlan, J., dissenting). Under Justice Harlan's formulation, the finality of criminal convictions would be assured without offending the institutional check of judicial review in the first instance.

During the development of the retroactivity doctrine, "[h]abeas corpus always ha[d] been a collateral remedy, providing an avenue for upsetting judgments that ha[d] become otherwise final." *Williams*, 401 U.S. at 682–683, 91 S.Ct. 1171 (Harlan, J., dissenting). At that time, habeas corpus existed "to inquire into every constitutional defect in any criminal trial," *Id.*, at 685, 91 S.Ct. 1171, such that it provided, "a quasi-appellate review function, forcing trial and appellate courts in both the federal and state system to toe the constitutional mark." *Id.* at 687, 91 S.Ct. 1171.

Nevertheless, the touchstone for the entire finality analysis does not focus on the

legal vehicle through which a defendant brings his claims to the courthouse (e.g. writ of habeas corpus), but rather, "on the nature, function, and scope of the adjudicatory process" in which that case arose. *Id.,* at 682, 91 S.Ct. 1171. In other words, the relevant inquiry was on "the purpose for which the writ of habeas corpus is made available." *Id.* Justice Harlan understood all cases brought under habeas corpus to be, *ipso facto,* 'final.' *See id.* at 681, 91 S.Ct. 1171. Underlying this understanding, however, was the assumption that the challenged conviction had previously, "been adjudicated by a court cognizant of the Federal Constitution and duty bound to apply it." *Id.,* at 689, 91 S.Ct. 1171. In fact, habeas corpus cases are not solely collateral, but are oftentimes "clearly appellate." *See* 1 Randy Hertz & James S. Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE, § 2.2, (4th ed.2001) (internal citations omitted). Justice Harlan acknowledged this possibility in noting that the relevant inquiry is not on whether the case is brought procedurally under a habeas corpus statute, but rather, on the "purposes" for which the case is brought. *Williams v. United States,* 401 U.S. at 682, 91 S.Ct. 1171 (Harlan, J., dissenting).

 The central question presented here is whether this case was 'final' when it came to this Court on habeas review. According to the government, this case became final on the date that Mr. Ash's parole was revoked by the United States Parole Commission—September 4, 2003. (Motion at 6–7.) In support of this position, the government cited a Parole Commission document stating that Mr. Ash's parole has been revoked, and that this "decision is not appealable." (Ex. L to Motion.) The government, therefore, urges the Court to apply the law as it existed on September 4, 2003, the date at which, they contend, the decision became final.

According to the Court in *Teague,* a case is final " 'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before" the new decision. *Teague,* 489 U.S. at 295, 109 S.Ct. 1060, *citing Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). The government understands the Commission's proclamation of the non-appealable nature of its revocation hearing as the type of appeal to which the Court in *Teague* is concerned. This Court cannot agree. The early discussions of the retroactivity doctrine discussed above make certain that a decision is final only after it has been "adjudicated by a court cognizant of the Federal Constitution and duty bound to apply it." *Williams,* 401 U.S. at 689, 91 S.Ct. 1171 (Harlan, J., dissenting). It therefore involves an essential balancing between "anti-majoritarian judicial control" and the concern that "an abrupt innovation . . . would furnish opportunities hitherto uncontemplated for opening wide the prison doors of the land." *Foster v. People of the State of Illinois,* 332 U.S. 134, 67 S.Ct. 1716, 91 L.Ed. 1955 (1947). As such, the type of appeal that marks 'finality' is one undertaken by a member court in the independent judiciary, not the executive—a branch of government institutionally incompetent to render independent judgment on the constitutional sufficiency of its own actions. It is only through judicial oversight, either through a trial or other judicial proceeding in the first instance, or through subsequent judicial review of an executive action, that a court can "adjudicate every issue, including federal constitutional issues." *Williams,* 401 U.S. at 682, 91 S.Ct. 1171 (Harlan, J., dissenting). This review is essential, and represents "the entire theoretical underpinnings of judicial review." *Id.*

The present case differs from all of the retroactivity cases discussed previously in that the Petitioner here is not challenging the constitutionality of an underlying criminal trial, or more generally, some other form of judicial proceeding. Rather, he claims constitutional deficiencies of a Parole Commission hearing—an executive action carrying significant liberty implications. The government's claim that this type of hearing is "not appealable" runs contrary to the "awesome power of judicial review, this duty to bind coordinate branches of the federal system with our view of what the Constitution dictates." *Williams*, 401 U.S. 667, 678, 91 S.Ct. 1171, 28 L.Ed.2d 404 (Harlan, J. concurring). The central issue, in sum, is whether there exists "finality in the judicial process," not, as the government contends, finality in an executive proceeding void of judicial review. *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).[2] Were the Court to accept the government's position in this regard, the writ of habeas corpus would no longer remain "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi v. Rumsfeld*, — U.S. —, —, 124 S.Ct. 2633, 2644, 159 L.Ed.2d 578 (2004).

Nowhere in the developed history of retroactivity jurisprudence has any court intimated a restriction on a criminal defendant's access to an independent determination, in the first instance, of the constitutionality of his incarceration.

This case will become final only when this Court's decision is reviewed by an appellate body and when the time for an application for a writ of certiorari has come and gone. Only then has there been "finality in the judicial process." *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). And only then is the "availability of the appeal exhausted, and the time for petition for certiorari" passed. *Teague*, 489 U.S. at 295, 109 S.Ct. 1060. And only then will subsequent judicial bodies reviewing this case be bound by *Teague* to look back to the status of the law as it was, rather than at how the law then dictates. But until that time, this Court must apply today's law, including *Crawford v. Washington*.

Thus, the application of *Crawford v. Washington* to the current case does not violate the prohibition on applying 'new' rules of criminal procedure retroactively.[3]

## III. CONCLUSION

For the reasons stated above, the government's motion to reconsider is hereby **DENIED**. An appropriate order will follow.

**SO ORDERED.**

---

**2.** The cases cited by the government buttress this Court's conclusion. According to the government, "[t]he 'new rule' principle therefore 'validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.'" (Motion at 2, citing *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), *O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997)). Unlike

*Butler*, here, there has been no state court interpretation of existing precedents. That first look, by a judicial body, is occurring now, by this Court.

**3.** Because this Court finds that it is free to apply *Crawford v. Washington*, the Court need not engage an analysis as to whether *Crawford v. Washington* meets the criteria of a new rule of criminal procedure as defined in *Teague*.