******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom McDONALD, J., joins, dissenting. I respectfully dissent. I disagree with the majority's conclusion that *Padilla* v. *Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010), does not apply retroactively to the guilty plea of the petitioner, Emmanuel Thiersaint. Instead, I would apply *Padilla* to the petitioner's claim and would conclude that the advice given by the petitioner's counsel constituted ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Accordingly, I respectfully dissent.

As the majority has explained, the resolution of the respondent's first claim on appeal requires us to determine whether the rule announced in *Padilla* applies retroactively to the petitioner's guilty plea or whether it was a new rule. I agree with the factual and procedural history set forth in the majority opinion. I also agree with the majority regarding the standard of review governing the petitioner's claim. "Although the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel." (Citations omitted; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 469–70, 68 A.3d 624, cert. denied sub nom. *Dzurenda* v. *Gonzalez*, U.S. , 134 S. Ct. 639, 187 L. Ed. 2d 445 (2013).

In *Padilla* v. *Kentucky*, supra, 559 U.S. 366, the United States Supreme Court concluded that the *Strickland* standard for effective assistance of counsel applied to a petitioner's claim that his counsel had improperly failed to advise him of the immigration consequences of a guilty plea. In doing so, the United States Supreme Court recognized that "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction is thus ill suited to evaluating a *Strickland* claim concerning the specific risk of

deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the [s]ixth [a]mendment right to counsel. *Strickland* applies to [the petitioner's] claim." Id.

The United States Supreme Court further concluded that the petitioner had satisfied the first prong of *Strickland* because "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for [the petitioner's] conviction. . . . [The petitioner's] counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, [the petitioner's] counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of [the petitioner's] plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." (Citation omitted.) Id., 368–69.

The United States Supreme Court further recognized the following: "Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear." (Footnote omitted.) Id., 369.

In *Chaidez* v. *United States*, U.S. , 133 S. Ct. 1103, 1105, 185 L. Ed. 2d 149 (2013), the United States Supreme Court considered whether the ruling in *Padilla* "that the sixth amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea" applies "retroactively, so that a person whose conviction became final before we decided *Padilla* can benefit from it." The United States Supreme Court considered the claim in *Chaidez* under the principles set out in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

In *Teague*, the United States Supreme Court held that a criminal defendant cannot collaterally attack a conviction on the basis of a new rule of criminal procedure identified after the conviction became final. Id.,

299. Thus, where a " 'new rule' " is announced, "a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding." *Chaidez* v. *United States*, supra, 133 S. Ct. 1107. A "case announces a new rule when it breaks new ground or imposes a new obligation" on the government; that is, the result of the case "was not dictated by precedent existing at the time the defendant's conviction became final"; (emphasis omitted; internal quotation marks omitted) *Teague* v. *Lane*, supra, 489 U.S. 333; or was not "apparent to all reasonable jurists." (Internal quotation marks omitted.) *Chaidez* v. *United States*, supra, 1107. The court in *Teague* did, however, recognize two important exceptions to the nonretroactivity rule. "First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. . . . Second, a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." (Citation omitted; internal quotation marks omitted.) *Teague* v. *Lane*, supra, 307.

In *Chaidez*, the United States Supreme Court reasoned as follows: "Before *Padilla*, we had declined to decide whether the [s]ixth [a]mendment had any relevance to a lawyer's advice about matters not part of a criminal proceeding. Perhaps some advice of that kind would have to meet *Strickland*'s reasonableness standard—but then again, perhaps not: No precedent of our own 'dictated' the answer. . . . All we say here is that *Padilla*'s holding that the failure to advise about a [noncriminal] consequence could violate the [s]ixth [a]mendment would not have been—in fact, was not— 'apparent to all reasonable jurists' prior to our decision. . . . *Padilla* thus announced a 'new rule.' " (Citations omitted; emphasis omitted; footnote omitted.) *Chaidez* v. *United States*, supra, 133 S. Ct. 1110–11. The United States Supreme Court, accordingly, refused to apply the *Padilla* rule retroactively to the petitioner's federal habeas claim for ineffective assistance of counsel related to her counsel's failure to inform her of the immigration consequences of her guilty plea. Id.

Although I agree with the majority that *Chaidez* controls the question as it relates to federal habeas claims, I disagree with the majority's failure to fully recognize the impact of *Danforth* v. *Minnesota*, 552 U.S. 264, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008), and its progeny on state habeas claims. In *Danforth*, the United States Supreme Court recognized that "the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own . . . convictions." Id., 280–81.

The court further stated that because "[f]ederalism and comity considerations are unique to federal habeas review of state convictions . . . comity militate[s] in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*." (Citations omitted; emphasis omitted.) Id., 279–80. Therefore, the United States Supreme Court made clear that the decision of whether to apply a new rule in a state habeas proceeding is left entirely to the state.

Indeed, in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 753 n.14, 12 A.3d 817 (2011), this court recognized that, "[u]nder *Teague*, new rules of criminal procedure do not apply retroactively to already final judgments in *federal* habeas proceedings unless they fall under one of several specified exceptions. *Teague* v. *Lane*, supra, [489 U.S. 310.] Although this court has in the past applied the *Teague* framework to state habeas proceedings as well; see, e.g., *Johnson* v. *Warden*, 218 Conn. 791, 797, 591 A.2d 407 (1991); the United States Supreme Court recently held in *Danforth* v. *Minnesota*, [supra, 552 U.S. 282], that the restrictions *Teague* imposes on the fully retroactive application of new procedural rules are not binding on the states." (Emphasis added.)

The majority states that "[c]ontrary to the petitioner's suggestion, our reference in *Luurtsema* to *Danforth* did not mean that this court was not bound by *Teague*, but, rather, was intended to describe the reasoning in *Danforth*." I disagree. In my view, in *Luurtsema*, this court recognized that *Danforth* changed the landscape of this area of state law and we were no longer required to follow *Teague* for state habeas claims that involved application of new procedural rules. Although *Luurtsema* did not involve the retroactive application of a procedural rule, it clearly indicated an intention by this court to reconsider whether *Teague* would apply to Connecticut habeas proceedings involving retroactive application of procedural rules when a case presented that issue.

I also disagree with the majority's statement that "[f]urthermore, even the petitioner has recognized that, on the few occasions when Connecticut courts have considered *Teague*, they have applied its principles without hesitation." First, two of the cases cited by the majority, *Duperry* v. *Solnit*, 261 Conn. 309, 312, 803 A.2d 287 (2002), and *Johnson* v. *Warden*, supra, 218 Conn. 796–98, were decided long before *Danforth* made clear that the decision of whether to apply a new rule in a state habeas proceeding is left entirely to the state. Accordingly, these cases are not relevant to the inquiry in the present case, namely, whether, in light of *Danforth*, this state will choose to apply the new procedural rule established in *Padilla* retroactively in state habeas proceedings.

The only other case from this court cited by the

majority for the proposition that "when Connecticut courts have considered *Teague*, they have applied its principles without hesitation" is *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). First, *Payne* was not a habeas proceeding. Id., 541. Instead, in *Payne*, this court considered whether the trial court properly joined the defendant's felony murder and jury tampering cases for trial. Id., 541–42. In *Payne*, this court adopted a new burden of proof concerning joinder at trial and applied it in the defendant's direct appeal in that case. Id., 549–50. In a footnote, this court stated as follows: "Because this rule of law pertains to the party bearing the burden of proof, it is procedural, and not substantive, and therefore will not apply retroactively in habeas proceedings. See *Luurtsema* v. *Commissioner of Correction*, [supra, 299 Conn. 753–54]; see also *Bousley* v. *United States*, 523 U.S. 614, 620, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) ('unless a new rule of criminal procedure is of such a nature that without [it] the likelihood of an accurate conviction is seriously diminished . . . there is no reason to apply the rule retroactively on habeas review' . . .)." *State* v. *Payne*, supra, 550 n.10. As explained previously herein, in *Luurtsema*, this court explicitly recognized that the restrictions *Teague* imposes on the fully retroactive application of new procedural rules are not binding on the states and left that question open. In my view, the citation to *Luurtsema* in *Payne* is misplaced and cannot be considered in this court's resolution of how to apply the restrictions of *Teague* in state habeas proceedings.[1]

Having concluded that we are not bound by a strict adherence to *Teague*, I would undertake a close examination of the United States Supreme Court's opinion in *Teague* to determine how to apply its principles in this state habeas proceeding. In *Teague*, the petitioner in a federal habeas proceeding claimed that the United States Supreme Court should adopt a new rule applying the sixth amendment's fair cross section requirement to the petit jury. *Teague* v. *Lane*, supra, 489 U.S. 299. The United States Supreme Court refused to address the petitioner's claim because it concluded, as a threshold matter, that "the rule urged by [the] petitioner should not be applied retroactively to cases on collateral review . . . ." Id.

In deciding the threshold issue of retroactive application, the United States Supreme Court acknowledged that "[t]his retroactivity determination would normally entail application of the [standard set forth in *Linkletter* v. *Walker*, 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965)], but we believe that our approach to retroactivity for cases on collateral review requires modification." *Teague* v. *Lane*, supra, 489 U.S. 301. The United States Supreme Court then explained that, "[i]t is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retro-

activity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the [s]tates or the [f]ederal [g]overnment." Id.

"The *Linkletter* retroactivity standard has not led to consistent results. Instead, it has been used to limit application of certain new rules to cases on direct review, other new rules only to the defendants in the cases announcing such rules, and still other new rules to cases in which trials have not yet commenced." Id., 302. The court in *Teague* then traced the recent history of the *Linkletter* rule and the rejection of that rule as follows: "Dissatisfied with the *Linkletter* standard, Justice Harlan advocated a different approach to retroactivity. He argued that new rules should always be applied retroactively to cases on direct review, but that generally they should not be applied retroactively to criminal cases on collateral review. See *Mackey* v. *United States*, [401 U.S. 667, 675, 91 S. Ct. 1160, 28 L. Ed. 2d 404] (1971) (opinion concurring in judgments in part and dissenting in part); *Desist* [v. *United States*, 394 U.S. 244, 256, 89 S. Ct. 1030, 22 L. Ed. 2d 248 (1969) (Harlan, J., dissenting)].

"In *Griffith* v. *Kentucky*, [479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649] (1987), we rejected as unprincipled and inequitable the *Linkletter* standard for cases pending on direct review at the time a new rule is announced, and adopted the first part of the retroactivity approach advocated by Justice Harlan. We agreed with Justice Harlan that 'failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication.' [Id., 322]. . . . Although new rules that constituted clear breaks with the past generally were not given retroactive effect under the *Linkletter* standard, we held that 'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past.' " (Citations omitted.) *Teague* v. *Lane*, supra, 489 U.S. 303–305.

In *Teague*, the United States Supreme Court also recognized that although Justice Harlan believed that new rules generally should not be applied retroactively to cases on collateral review, he "identified only two exceptions to his general rule of nonretroactivity for cases on collateral review. First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. . . . Second, a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." (Citation omitted; internal quotation marks omitted.) Id., 307. The court in *Teague* concluded that "we now adopt

Justice Harlan's view of retroactivity for cases on collateral review. Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Id., 310.

The court in *Teague* then explained that they applied the second exception suggested by Justice Harlan with a modification. Specifically, the court in *Teague* recognized that the second exception was to allow the retroactive application of new rules where the "procedure at issue must implicate the fundamental fairness of the trial" and "be so central to an accurate determination of innocence or guilt . . . ." Id., 312–13. The court in *Teague* then concluded that "[b]ecause the absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction, we conclude that a rule requiring that petit juries be composed of a fair cross section of the community would not be a 'bedrock procedural element' that would be retroactively applied under the second exception we have articulated." Id., 315.[2]

As I have explained previously in this opinion, this court is not bound to apply the framework of *Teague* to state habeas proceedings. Although I agree with the majority that many states have applied *Teague* in deciding state habeas claims, I find it instructive that the majority of those decisions were prior to *Danforth*, which made clear that states were not required to follow *Teague* for purposes of their state habeas proceedings. See footnote 11 of the majority opinion. Indeed, only twelve of the decisions cited by the majority occurred after *Danforth*.[3]

Instead, I find persuasive the decisions of the Nevada Supreme Court in *Colwell* v. *State*, 118 Nev. 807, 59 P.3d 463 (2002) (per curiam), cert. denied, 540 U.S. 981, 124 S. Ct. 462, 157 L. Ed. 2d 370 (2003), and the Idaho Supreme Court in *Rhoades* v. *State*, 149 Idaho 130, 233 P.3d 61 (2010), cert. denied, U.S. , 131 S. Ct. 1571, 179 L. Ed. 2d 477 (2011). Both Nevada and Idaho have adopted modified versions of the *Teague* test. *Colwell* v. *State*, supra, 819; *Rhoades* v. *State*, supra, 136.

In *Colwell* v. *State*, supra, 118 Nev. 818–19, the Nevada Supreme Court stated as follows: "Though we consider the approach to retroactivity set forth in *Teague* to be sound in principle, the [United States] Supreme Court has applied it so strictly in practice that decisions defining a constitutional safeguard rarely merit application on collateral review. . . . We appreciate that strictly constraining retroactivity serves the [United States] Supreme Court's purpose of circumscribing federal habeas review of state court decisions, but as a state court we choose not to bind quite so severely our own

discretion in deciding retroactivity. We therefore choose to adopt with some qualification the approach set forth in *Teague*. We adopt the general framework of *Teague*, but reserve our prerogative to define and determine within this framework whether a rule is new and whether it falls within the two exceptions to nonretroactivity (as long as we give new federal constitutional rules at least as much retroactive effect as *Teague* does)." (Footnotes omitted.)

The Nevada Supreme Court further concluded that "consistent with the *Teague* framework, we will not apply a new constitutional rule of criminal procedure to finalized cases unless it falls within either of two exceptions. There is no bright-line rule for determining whether a rule is new, but there are basic guidelines to follow. . . . When a rule is new, it will still apply retroactively in two instances: (1) if the rule establishes that it is unconstitutional to proscribe certain conduct as criminal or to impose a type of punishment on certain defendants because of their status or offense; or (2) if it establishes a procedure without which the likelihood of an accurate conviction is seriously diminished. These are basically the exceptions defined by the [United States] Supreme Court. But we do not limit the first exception to 'primary, private individual' conduct, allowing the possibility that other conduct may be constitutionally protected from criminalization and warrant retroactive relief. And with the second exception, we do not distinguish a separate requirement of 'bedrock' or 'watershed' significance: if accuracy is seriously diminished without the rule, the rule is significant enough to warrant retroactive application." (Footnotes omitted.) Id., 819–20. In adopting the modified approach, the Nevada Supreme Court reasoned that "this adaptation of the approach taken in *Teague* and its progeny provides us with a fair and straightforward framework for determining retroactivity." Id., 820.

Similarly, the Idaho Supreme Court adopted the *Teague* approach when determining whether decisions of the United States Supreme Court and the appellate courts of Idaho should be given retroactive effect. *Rhoades* v. *State*, supra, 149 Idaho 136. Nevertheless, the Idaho Supreme Court reasoned that "[w]hile the [United States] Supreme Court has strictly interpreted *Teague* to avoid excessive interference by federal habeas courts in state criminal convictions that have become final, this [c]ourt does not have a similar concern for comity when interpreting whether a decision pronounces a new rule of law for purposes of applying *Teague*. As the holding in *Danforth* . . . makes clear, when deciding whether to give retroactive effect to a decision of the [United States] Supreme Court, this [c]ourt is not required to blindly follow that court's view of what constitutes a new rule or whether a new rule is a watershed rule." Id., 139. Instead, the Idaho Supreme Court concluded that "in the future, the deci-

sions of the courts of this state whether to give retroactive effect to a rule of law should reflect independent judgment, based upon the concerns of this [c]ourt and the 'uniqueness of our state, our [c]onstitution, and our long-standing jurisprudence.' *State* v. *Donato*, 135 Idaho 469, 472, [20 P.3d 5] (2001) (noting that when this [c]ourt has found that the Idaho [c]onstitution provides greater protection than the [United States constitution], it has done so, 'on the uniqueness of our state, our [c]onstitution, and our long-standing jurisprudence')." *Rhoades* v. *State*, supra, 139.

Like the Nevada Supreme Court and the Idaho Supreme Court, I would conclude that this court should adopt the principles of *Teague*, but in deciding whether to give retroactive effect to a new rule, this court should exercise independent judgment on the basis of the unique requirements of our state constitution, judicial precedents and statutory framework. Furthermore, I would conclude that in implementing the second exception in *Teague*, "if accuracy is seriously diminished without the rule, the rule is significant enough to warrant retroactive application." *Colwell* v. *State*, supra, 118 Nev. 820. Indeed, if the rule is so central to an accurate plea or conviction and the fundamental fairness of a trial or plea is seriously diminished without the rule, the rule is significant enough to warrant retroactive application. See *Teague* v. *Lane*, supra, 489 U.S. 312–13 ("procedure at issue must implicate the fundamental fairness of the trial" and "be so central to an accurate determination of innocence or guilt").[4]

Having concluded that we should adopt a modified version of *Teague* on the basis of the uniqueness of our state constitution, precedents and statutory framework, I turn to whether we should give retroactive effect to the rule announced in *Padilla* that the sixth amendment right to counsel requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea. I answer that question in the affirmative.

Before addressing whether we should give retroactive effect to *Padilla* in the present case, it is important to note that the habeas court made a factual finding that "[h]ad the petitioner known that he faced certain and permanent removal from the United States when he pleaded guilty to the charge of possession with intent to sell, he would not have pleaded guilty, but would have insisted on going to trial. The petitioner would prefer a long jail sentence in the United States rather than suffer permanent banishment from the United States to Haiti." On the basis of that finding, I would conclude that the failure of the petitioner's attorney to inform the petitioner of the immigration consequences of his plea undermines the accuracy of his guilty plea, and leads me to the conclusion that the fundamental fairness of the plea process was seriously flawed.

In making this determination, I first look to the unique requirements and history of the right to counsel under our state constitution. "This state has had a long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance. Until 1836, the common law of England denied the services of counsel to a person charged with a felony for anything but advisory guidance on questions of law. *Powell* v. *Alabama*, 287 U.S. 45, 60, 53 S. Ct. 55, 77 L. Ed. 158 (1932). This rule was defended largely on the theory that the court itself was counsel for the accused. Id., 61.

"Although in 1708 Connecticut enacted a law prohibiting pleading for hire without the express consent of the court; *State* v. *Gethers*, 197 Conn. 369, 389–90 n.19, 497 A.2d 408 (1985); the custom of assigning counsel in all criminal cases quickly became the norm. *State* v. *Davis*, 199 Conn. 88, 99, 506 A.2d 86 (1986). By the end of the eighteenth century, the Connecticut legislature had abolished all those odious laws arising from the English common law tradition and had assured that any person charged with a crime was entitled to . . . counsel . . . ." (Internal quotation marks omitted.) *State* v. *Stoddard*, 206 Conn. 157, 164–65, 537 A.2d 446 (1988).

Writing for this court in *State* v. *Stoddard*, supra, 206 Conn. 165, Chief Justice Peters went on to explain that "[w]hen the customary right to counsel was formally incorporated into the Connecticut constitution in 1818, the advice and services of counsel were regarded as crucial to a criminal defendant at any time, especially given the inability of a defendant to testify in Connecticut in 1818. . . . More contemporary developments suggest that this state's commitment to securing the right to counsel has not diminished since 1818. Not only was Connecticut the first state to adopt the public defender system . . . but the right to counsel was secured to criminal defendants in this state long before the mandate of *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 [(1962) (holding that the fourteenth amendment incorporated the sixth amendment right to counsel)] . . . . The United States Supreme Court has turned to the historical experience of Connecticut in expanding the right to counsel under the federal constitution. *Faretta* v. *California*, 422 U.S. 806, 827, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Powell* v. *Alabama*, supra, [287 U.S.] 62–63." (Citations omitted; internal quotation marks omitted.)

"This rich history demonstrates that 'the fundamental right to counsel is elevated to the highest order.' *State* v. *Hamilton*, 228 Conn. 234, 260, 636 A.2d 760 (1994) (*Berdon*, *J.*, dissenting). Indeed, even before the initiation of the adversarial judicial proceeding—that is, before arraignment—we have held that under our state constitution, a suspect's 'waiver of presence of counsel can, under certain circumstances, be shown invalid if

the police fail to inform a suspect of [his counsel's efforts to communicate with him].' *State* v. *Stoddard*, supra, 206 Conn. 173. This holding was based on the duty of the police to 'act reasonably, diligently and promptly to provide counsel [for the suspect] with accurate information and to apprise the suspect of the efforts by counsel.' Id., 167. If, under the state constitution, prearraignment waiver of counsel is invalidated when an accused is not informed of his counsel's request to speak to him, it logically follows that there can be no effective postarraignment waiver without the presence of appointed counsel." *State* v. *Piorkowski*, 243 Conn. 205, 229, 700 A.2d 1146 (1997) (*Berdon*, *J.*, dissenting).

As the foregoing demonstrates, the right to counsel under our state constitution has a rich history predating that of the right to counsel under the federal constitution and we have repeatedly held that the state constitution affords broader protection of the right to counsel than the federal constitution. I would conclude that the unique and broad protections of the right to counsel under our state constitution weigh in favor of giving retroactive effect to *Padilla* in a state habeas proceeding.

I next turn to the unique statutory framework of the state. The habeas court found that, at the time of the petitioner's plea in 2007, there existed an "established professional norm in this state, that the defendant's counsel discuss the immigration consequences of his plea with the defendant." In support of its conclusion the habeas court credited the expert testimony offered by the petitioner that the petitioner's counsel at the time of the plea "also had a duty to inform a noncitizen defendant that if he pleaded guilty to [an aggravated felony] after the completion of his Connecticut sentence, he would not be released but would be turned over to federal immigration authorities and mandatorily detained pending deportation proceedings, that there was no legitimate defense to removal, that he would ultimately be removed from the United States and returned to his country of origin, and that he would be permanently barred from returning . . . ." (Footnote omitted.) Thus, the habeas court found that counsel's obligation in 2007 was not only to mention immigration consequences, but also to provide accurate advice about them. The habeas court further found that the "existence and application" of General Statutes § 54-1j, provided "further evidence" of this established professional norm.

In 1982, the legislature enacted § 54-1j; see Public Acts 1982, No. 82-177; which prohibits judges of the Superior Court from accepting a guilty plea from a defendant unless the court advised the defendant that if he or she is a noncitizen, a conviction could result in deportation. I note that it was not until December 1, 2013, that the Federal Rules of Criminal Procedure

required federal courts before accepting a plea to "inform the defendant of, and determine that the defendant understands . . . that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Fed. R. Crim. P. 11 (b) (1). The Advisory Committee on Federal Rules of Criminal Procedure that recommended the change to the federal rules expressly relied on *Padilla*'s recognition that an informed plea requires the defendant to be aware of immigration consequences that may result from the plea. Advisory Committee on Federal Rules of Criminal Procedure, "Report of the Advisory Committee on Criminal Rules," (2010), p. 2, available at http://www.uscourts.gov/uscourts/RulesAnd Policies/rules/Reports/CR12-2010.pdf (last visited March 26, 2015).

In 2003, prior to the petitioner's plea in the present action, the legislature amended § 54-1j to, inter alia, add the following requirement: "If the defendant has not discussed these possible [immigration] consequences [of the conviction] with the defendant's attorney, the court shall permit the defendant to do so prior to accepting the defendant's plea." Public Acts 2003, No. 03-81, § 1. The addition of this requirement prohibited courts from accepting a plea without first ensuring that a defendant had an opportunity to speak with his criminal counsel regarding the immigration consequences of accepting the plea. This amendment to § 54-1j is significant because it demonstrates Connecticut's early recognition that the broad expansion of the categories of offenses triggering automatic deportation, and the elimination of avenues for relief under federal immigration law trigger greater responsibility for criminal defense attorneys to ensure their clients know, when accepting a plea deal, that they may be accepting deportation. The requirement that every defendant have an opportunity to speak with his or her defense counsel regarding the immigration consequences of a plea assumes that the criminal attorney will be equipped to provide meaningful and accurate advice as to what those immigration consequences are likely to be. The statute's requirement that the judge provide the defendant with an opportunity to discuss the immigration consequences of the plea with "the defendant's attorney" confirms that the opportunity for discussion the provision mandates is between the defendant and his criminal defense counsel, guaranteed to him by *Gideon* v. *Wainwright*, supra, 372 U.S. 335, thereby ensuring that indigent noncitizen defendants will have an opportunity to consult with an attorney regarding the immigration consequences of a plea before accepting one. The added statutory provision would make little sense if there was not already a prevailing professional norm among attorneys in Connecticut that criminal defense counsel must be sufficiently versed in the immigration

consequences of criminal convictions so as to provide meaningful advice to their clients regarding the consequences of a plea. The prevailing norm, namely that criminal attorneys should accurately discuss immigration consequences with their clients, made the 2003 amendment to § 54-1j possible.

The 2003 amendment, in turn, helped solidify the standards of the Connecticut defense bar that effective representation entails advising clients of the immigration consequences of their pleas. As recognized in *Padilla* "[i]mmigration law can be complex, and it is a legal specialty of its own." *Padilla* v. *Kentucky*, supra, 559 U.S. 369. In *Padilla* the United States Supreme Court also noted that the "weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." (Internal quotation marks omitted.) Id., 367. The court demonstrated these professional norms through a panoply of training materials, the earliest of which was published in 1993. Id. As the trial court in the present case found, by 2005, a manual entitled "A Brief Guide to Representing Noncitizen Criminal Defendants in Connecticut," was available to criminal defense attorneys. The manual outlined the key potential pitfalls in representing noncitizen clients and provided a guide to common Connecticut criminal statutes and the immigration consequences of a conviction under those statutes. Indeed, the habeas court found that the petitioner's counsel had participated in seminars on representing noncitizen defendants and received the manual. The manual, which was updated in 2007 and again in 2010, also explored strategies for negotiating pleas that would avoid severe and disproportionate consequences for noncitizen clients. See J. Baron, "A Brief Guide to Representing Non-citizen Criminal Defendants in Connecticut," (2010), available at http://ctpublicdefendertraining.com/materials/immigration/CT_Crim_Imm_Guide2010.pdf (last visited March 26, 2015).[5]

As the foregoing demonstrates, the statutory framework of the state of Connecticut has long recognized the importance of an attorney advising his client of the immigration consequences of a plea. The fact that the state statutory framework recognized that an attorney must competently advise a defendant of the immigration consequences of a plea demonstrates that this state has considered such advice essential to ensuring the accuracy of the plea and the fundamental fairness of the process and, thus, supports the retroactive application of *Padilla* in this state's habeas proceedings. Certainly, as found by the habeas court, the petitioner would not have entered his plea if he was assured of deportation as a result thereof. In my view, the fundamental fairness of the plea process is unquestionably affected when the plea is based on inaccurate legal advice. Therefore, on the basis of this state's long history of affording greater protections than the federal

constitution regarding the right to counsel, I would conclude that *Padilla* should be applied retroactively under the facts of the present case.

In assessing trial counsel's performance in advising noncitizen defendants, *Padilla* announced a two-tiered analytical framework, the application of which depends on whether the immigration consequences are "truly clear" under the law or whether the law is uncertain. *Padilla* v. *Kentucky*, supra, 559 U.S. 369. Where the law is "not succinct [or] straightforward," counsel's duty is limited to doing "no more than advis[ing] a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. However, where the law is "truly clear, as it was in this case, the duty to give correct advice is equally clear." Id.

As in *Padilla*, the petitioner here was charged with a drug trafficking offense that clearly constituted an "aggravated felony" under federal law, and would result in certain and mandatory deportation from the United States. In *Padilla*, the United States Supreme Court found that "[the petitioner's] counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. . . . The consequences of [the petitioner's] plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." *Padilla* v. *Kentucky*, supra, 559 U.S. 368–69. Because the immigration consequences were "truly clear," the Supreme Court held counsel to the higher standard requiring that counsel provide the correct advice regarding the immigration consequences. In *Padilla*, counsel had advised the defendant that because he had been in the country so long, he did not have to worry about immigration consequences. Id., 359.

As noted by the habeas court, "[a]s in *Padilla*, the petitioner in this case was charged with a drug trafficking crime which [the] petitioner's counsel could have 'easily determined' from reading the statutes would result in presumptive mandatory deportation and ineligible to seek discretionary relief. Therefore, under *Padilla*, [the conduct of the petitioner's counsel] must be assessed under the stricter standard as to whether he provided the petitioner 'correct advice.' Because the law was clear and succinct, merely informing the petitioner that there was a risk of deportation would not be sufficient under *Padilla* in this case." The habeas court then concluded that "[t]he court finds that although [the petitioner's counsel at the time of the plea] had a general knowledge of immigration law, he was unaware of the specific consequences of the peti-

tioner's plea in this case and as a result was unable to, and did not, provide clear and accurate advice. Instead, [the petitioner's counsel at the time of the plea] gave the petitioner incomplete, unspecific and incorrect advice regarding the immigration consequences of his plea. Had [the petitioner's counsel] known the specific immigration consequences of the petitioner's [plea], he would not have deemed it necessary for the petitioner to consult with an attorney versed in immigration law. In particular, the advice was incorrect because it allowed for the possibility that the petitioner could prevail at a subsequent immigration proceeding, when in fact deportation was a virtual certainty."

I agree with the habeas court that *Padilla* should apply retroactively, and would conclude that the performance of the petitioner's counsel was constitutionally deficient. I would, therefore, affirm the decision of the habeas court. Accordingly, I respectfully dissent.

[1] The majority cites to three decisions from the Appellate Court and one from the Superior Court that rejected the retroactive application of *Padilla* to state habeas claims after *Chaidez*. See *Alcena* v. *Commissioner of Correction*, 146 Conn. App. 370, 374–75, 76 A.3d 742 (per curiam), cert. denied, 310 Conn. 948, 80 A.3d 905 (2013); *Saksena* v. *Commissioner of Correction*, 145 Conn. App. 152, 158–59, 76 A.3d 192, cert. denied, 310 Conn. 940, 79 A.3d 892 (2013); *Gonzalez* v. *Commissioner of Correction*, 145 Conn. App. 28, 33, 74 A.3d 509 (per curiam), cert. denied, 310 Conn. 929, 78 A.3d 145 (2013); *Gjini* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-10-4003834-S (March 6, 2013). A review of these decisions demonstrates that two of the three Appellate Court decisions, *Alcena* and *Gonzalez*, were per curiam opinions that applied *Chaidez* in one sentence without any analysis. *Alcena* v. *Commissioner of Correction*, supra, 374; *Gonzalez* v. *Commissioner of Correction*, supra, 33. In the third Appellate Court decision, *Saksena*, the petitioner had conceded in his supplemental brief that *Padilla* did not apply, so the court did not engage in any analysis of the issue whatsoever. *Saksena* v. *Commissioner of Correction*, supra, 158. The Superior Court's analysis in *Gjini* v. *Warden*, supra, is equally conclusory. Furthermore, none of the Connecticut cases cited by the majority analyzed the claim in light of Connecticut's unique constitutional and statutory framework. Accordingly, these decisions are not persuasive authority and can hardly represent this state's law regarding whether *Padilla* should apply retroactively to state habeas claims.

The majority claims that I "[miss] the point that [these cases] are cited only to show that, contrary to the petitioner's assertion, the retroactive application of *Padilla* could result in the filing of a large number of claims because the pool of potential applicants is not necessarily extremely limited." See footnote 12 of the majority opinion. First, I disagree with the majority that the retroactive application of *Padilla* could result in the filing of a large number of claims because the majority of the individuals with convictions similar to the petitioner's would likely already have been deported because the petitioner's deportation was only halted because of the political situation in Haiti. Second, even if the retroactive application of *Padilla* does result in the filing of a large number of claims, I disagree that this is a valid reason not to retroactively apply a rule that implicates the fundamental fairness of the plea process and is so central to the validity of the plea. The fundamental fairness of the plea process should trump any floodgates argument. Moreover, in order to challenge a conviction under *Padilla*, an individual must still meet the stringent test of *Strickland*. Accordingly, I am not persuaded by the majority's argument that applying *Padilla* retroactively to state habeas proceedings would result in the filing of a large number of claims.

[2] The court in *Teague* commented that "[t]he language used by Justice Harlan in *Mackey* leaves no doubt that he meant the second exception to be reserved for watershed rules of criminal procedure: 'Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and

growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the *bedrock procedural elements* that must be found to vitiate the fairness of a particular conviction. For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime.' [*Mackey* v. *United States*, supra, 401 U.S. 693–94].'' (Emphasis in original.) *Teague* v. *Lane*, supra, 489 U.S. 311–12.

[3] Of the twelve decisions cited by the majority that apply a *Teague* analysis of retroactivity after *Danforth*, only four of those decisions involve the retroactive application of *Padilla*. Furthermore, in most of the decisions cited by the majority, the courts do not indicate that their respective state constitutions provide greater protections than the federal constitution. See, e.g., *In re Gomez*, 45 Cal. 4th 650, 655, 199 P.3d 574, 88 Cal. Rptr. 3d 177 (2009) (''[o]rdinarily, we will provide a remedy on collateral review of a final judgment if that remedy would be available in the federal courts''). As I explain more fully herein, this court has consistently held that the right to counsel under our state constitution is broader than the right to counsel under the federal constitution. Accordingly, the analysis in these cases is not persuasive to the question presented in the present appeal.

[4] The majority asserts that ''[r]egardless of how Justice Eveleigh's approach is characterized, it virtually swallows the exception because it allows the court to decide whether a constitutional rule is new on the basis of whatever the court finds persuasive, including Connecticut's statutory framework and whether the trial or plea is deemed to be 'fair' without application of the rule.'' I disagree. The United States Supreme Court in *Teague* recognized that a new rule regarding a procedure that ''implicate[s] the fundamental fairness of the trial'' and is ''so central to an accurate determination of innocence or guilt'' must be applied retroactively. *Teague* v. *Lane*, supra, 489 U.S. 312–13. In the present case, the habeas court made the finding that the petitioner would not have pleaded guilty to the charge had he been properly advised of the immigration consequences of his plea. It is axiomatic that a plea is only valid if it is knowing, intelligent and voluntary. See *Brady* v. *United State*s, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970) (''[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences''). Therefore, the accuracy of the petitioner's plea is implicated in the present case. The habeas court found that if he had not had inaccurate or misleading information from his attorney, he would not have pleaded guilty. Thus, the inaccurate and misleading information from his attorney compromised the foundation for the petitioner's plea. My position in the present case does not obliterate the second *Teague* exception, but is merely a logical extension of that exception in light our state's unique constitutional and statutory framework.

It is important to remember that the standard for evaluating whether the second exception applies is not whether the ultimate outcome for the petitioner would have been different (i.e., would a jury ultimately have convicted the defendant). Indeed, we can not make such factual assessments based on the procedural posture of the present case, which resulted in a plea. The appropriate analysis is whether the new rule implicates the fundamental fairness of the process and is so central to the ultimate determination—in this case, a valid guilty plea.

Furthermore, the majority criticizes my approach ''because it permits an overly broad interpretation of 'fundamental fairness.' '' See footnote 19 of the majority opinion. I did not create the reference to the concept of ''fundamental fairness'' in the second exception. The United States Supreme Court itself included the concept of ''fundamental fairness'' as part of the second exception in *Teague*. See *Teague* v. *Lane*, supra, 489 U.S. 312 (''[w]e believe it desirable to combine the accuracy element of the *Desist* version of the second exception with the *Mackey* requirement that the procedure at issue must implicate the fundamental fairness of the trial''). Therefore, any criticism of having to apply the concept of ''fundamental fairness,'' is a criticism of *Teague* itself, which the majority claims to adopt.

[5] Furthermore, in light of the statutory requirements in Connecticut, I also assert that the requirement in *Padilla* that counsel advise their clients of the immigration consequences of a plea is arguably not a ''new rule'' in Connecticut. In support of my conclusion, I further note that the New Mexico Supreme Court has recently arrived at a similar conclusion. Specifically, in *Ramirez* v. *State*, 333 P.3d 240, 242 (N.M. 2014), the New Mexico Supreme Court considered the defendant's 1997 guilty pleas to the possession of

one ounce of marijuana, possession of drug paraphernalia, and concealing identity. In 2009, the defendant was informed that his pleas rendered him "inadmiss[ible] to the United States." (Internal quotation marks omitted.) Id. Thereafter, he sought to vacate his prior pleas on the basis of ineffective assistance of counsel. Id. The defendant asserted that his attorney had never advised him regarding the immigration consequences of his pleas. Id. The court noted that, in 2004, it had decided *State* v. *Paredez*, 136 N.M. 533, 539, 101 P.3d 799 (2004), in which it held that a criminal defense attorney who represents a noncitizen client "must advise that client of the specific immigration consequences of pleading guilty" to pending charges. In *Paredez*, the New Mexico Supreme Court held that in order to establish ineffective assistance of counsel, a defendant must show that: "(1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." (Internal quotation marks omitted.) Id., 538. "Advising a client that deportation is not a consequence when deportation is a possibility, advising the client that deportation is only a possibility when it is a virtual certainty, or failing to give the client any advice at all regarding immigration consequences all constitute evidence of deficient advice that could satisfy the first prong for ineffective assistance of counsel." *Ramirez* v. *State*, supra, 243. The New Mexico Supreme Court was then faced with the issue of whether to apply *Paredez* retroactively. The court noted that: "[p]ursuant to *Teague*, New Mexico does not give retroactive effect to a new criminal procedure rule. . . . The test determines whether a previously issued judicial opinion introduced a new rule of criminal procedure or merely expanded upon an already established rule. . . . A rule that is not deemed a 'new rule' by this test may apply retroactively." (Citations omitted.) Id., 244. The court then held that "[u]nlike the federal system, since 1990 New Mexico has required attorneys in all trial courts to advise their clients of the details of the plea colloquy. [The standard form used to enter a plea of guilty] was amended in 1990 to, among other things, require the judge to advise the defendant that a conviction may have an effect on the defendant's immigration status. [That form, which is] applicable to all New Mexico trial courts, also obligated the attorney to certify having explained the plea colloquy to the client in detail." Id. The court further noted that "[a]t the time [the defendant] entered his guilty pleas, additional immigration-specific and general guidelines existed which counseled defense attorneys on how to competently advise clients regarding immigration consequences. In 1995, the National Legal Aid and Defender Association recognized that '[i]n order to develop an overall negotiation plan, counsel should be fully aware of, and make sure the client is fully aware of . . . other consequences of conviction such as deportation . . . .' [National Legal Aid & Defender Association, 'Performance Guidelines for Criminal Defense Representation,' (1995) § 6.2]; [F. Bailey & K. Fishman, Handling Misdemeanor Cases (2d Ed. 1992) § 3.7, pp. 5–6] ('In misdemeanor cases, the possible consequences of a conviction may be so drastic that the defendant must take his or her chances on a trial. . . . A convicted alien may be deported.')." *Ramirez* v. *State*, supra, 246. Therefore, the court held that "[w]e fail to see how our holding in *Paredez*—seven years after [the defendant's] pleas and fourteen years after [the standard form used to enter a plea of guilty] was amended to require that the trial court assure a defendant's understanding that a guilty plea could affect the defendant's immigration status—announced a new rule." Id., 247.

The justification for the New Mexico Supreme Court's decision in *Ramirez* is remarkably similar to the background in the present case. First, the court noted that initially the New Mexico trial courts had to advise the clients that there could be deportation consequences as the result of a plea, just as § 54-1j has required since 1982. See Public Acts 1982, No. 82-177. Second, the New Mexico Supreme Court noted that, as of 1990, the attorneys were required to advise their clients of the consequences and potential deportation as the result of a plea, just as the 2003 amendment to § 54-1j provided that a trial judge in this state had to inquire if counsel had spoken with his client regarding the potential deportation ramifications of the pleas. See Public Acts 2003, No. 03-81, § 1. Third, the court noted the existence of publications which alerted the practitioner of the potential pitfalls in allowing a noncitizen to enter a plea, just as the Chief Public Defender's Office in Connecticut had a pamphlet published to alert practitioners regarding the dangers of entering pleas by noncitizens, well in advance of the petitioner's pleas. I am persuaded by the reasoning of the New Mexico Supreme Court in *Ramirez*.

---